[Civ. No. 15396. First Dist., Div. Two. Jan. 19, 1954.]

JAMES J. HESSION, Respondent, v. THE CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Appellant.

Hoberg & Finger for Respondent.

KAUFMAN, J.—The court granted a rehearing in this case to give further consideration to appellant's contention that the jury was improperly instructed as to proximate cause and that the trial court gave an erroneous instruction which brought about the exoneration of the codefendant, Western Pacific Railway.

Here the dangerous condition of the wire had existed for many years. There was a clear duty under the law requiring the city to maintain the wires at a height of 22 feet above the street. Whether this violation of the statute on the part of the city was a proximate cause of respondent's injury was for the jury to determine. The jury was properly instructed as to the proximate cause by the trial court and returned a verdict against the city. This verdict is therefore supported by both the law and the evidence.

Appellant's contention that the trial court gave an erroneous instruction which brought about the exoneration

of the codefendant, Western Pacific Railway, is answered in the case of *Sullivan* v. *City and County of San Francisco,* 95 Cal.App.2d 745 [214 P.2d 82]. The court there said in part, ''The city, as a joint tort feasor, has no legal right to complain that another joint tort feasor was improperly exonerated from liability, there being no right to contribution between joint tort feasors. . . . Under the facts if the city was negligent, and the evidence is overwhelming that it was, such negligence, as a matter of law, was at least a concurrent cause. This being so, even if the nonsuit as to the driver and owners of the truck was erroneously granted the city was not prejudiced, since one joint tort feasor has no legal cause for complaint if another tort feasor is relieved of liability, even erroneously, there being no right of contribution between them.''

Since appellant in its petition for rehearing did not question the accuracy of the recital of the specific facts in our opinion previously filed, nor our conclusion that its negligence was clearly established, we adopt our previous opinion as follows:

This is an action for personal injuries. When, on December 16, 1948, plaintiff as a member of a switching crew of the Western Pacific Railroad Company, hereinafter called the company, was riding on top of a boxcar which was being moved along a spur track across the intersection of Potrero Avenue and Alameda Street in San Francisco, his face struck against a wire of the street railway operated there at that time by the city and county of San Francisco, hereinafter called the city. He sued the city because of negligence in the maintenance, control and operation of the wires at too low a level above the spur track, and the company because of negligent failure to provide him with a safe place to work and to warn him of the danger caused by said wires. Recovery against the company was sought under the Federal Employer's Liability Act, against the city under the general law. After motions of defendants for directed verdicts had been denied the jury returned a verdict for the company but one against the city for $7,500. The city appeals. No appeal was taken from the judgment in favor of the company.

At the intersection Alameda Street runs east and west, Potrero Avenue north and south. The municipal trolley cars ran on Potrero Avenue. The single spur track runs on Alameda Street in a westerly direction to the intersection and curves diagonally over the intersection to a warehouse at the southwest corner of the intersection. Approximately

where the trolley tracks cross the spur track the two trolley wires, which provided the electric force for the trolleys, were supported by a set of two span wires both suspended from the same two poles located near the east and west curbs of Potrero Avenue. According to the scale map of the intersection (Plaintiff's Exh. 5) these poles were approximately 80 feet apart.

It is conceded by the city in its opening brief that respondent while on top of a boxcar which was being slowly pulled out of aforesaid warehouse across Potrero Avenue hit his nose against one of the wires of the municipal trolleys. It is there further conceded that under the General Orders of the Public Utilities Commission—formerly Railroad Commission—Nos. 26, 26B, 26C, 26D, which constituted at least a standard of the care required (*Polk* v: *City of Los Angeles*, 26 Cal.2d 519, 542 [159 P.2d 931]) the trolley wires should have been maintained with a minimum clearance of 22 feet above the railway tracks and that a lesser clearance would constitute a defective condition. No contention of contributory negligence of plaintiff is presented on appeal. Additional facts will be stated in connection with the assignments of error to which they pertain.

Appellant's first contention is that the motion for a directed verdict should have been granted because plaintiff had failed to prove that a defective condition of the wires existed at the time of the accident and for such a period before the accident that the city in the exercise of ordinary care should have discovered and corrected it. The contention is without merit. The evidence supporting the verdict in this respect is as follows: The principal witness, Brown, at the time of the accident a foreman and since February, 1949, general foreman of the line department of the municipal railway testified to the effect that the wire system at the intersection was originally installed in 1913-1914, that in 1934-1935, when Potrero Avenue was widened, the State of California had the poles and wires reconstructed by a contractor, after which there were no other major changes before the date of the accident. Four days after the accident the witness measured the trolley wires (the wires which carry the electricity) at the intersection and found that the southbound (western) trolley wire was 19 feet 10 inches, the northbound (eastern) trolley wire 20 feet above the spur tracks. At the time of the trial he measured the spots where the supporting span wires had been attached to the poles and found

that at the western pole the attachment had been 23 feet 10 inches, at the eastern pole 24 feet 4 inches from the ground. A span wire hung from one pole to another loops down in the center and a span of 50 or 60 feet will come down 2 or 3 feet or more. The trolley wires are suspended from the span wires and hang 2 or 3 inches under them. Between spans a' trolley wire normally sags 9 or 10 inches. The witness knew and had in his possession the Public Utilities Commission's General Order No. 26D, which was in effect in December, 1948. He worked with it all the time. He was familiar with its provision which for wires required a minimum clearing of 23 feet 6 inches above steam railroad tracks, and also with an earlier General Order, 26B, in effect at the time of the reconstruction in 1935, which required a minimum clearance of 22 feet. He was one of the people responsible for the lines being at the proper height. He had never measured the wires at the intersection prior to December 20, 1948, had made no inspection to determine whether they were not maintained contrary to the law and to his knowledge nobody else connected with the municipal railway had at any time made such inspection. The distance of only 20 feet above the railroad track did not comply with the order of the Public Utilities Commission and was not safe so far as a man on top of a car was concerned. (Witness said on top of a *street* car but obviously meant on top of a railway car.) The city did not introduce any evidence which tended to contradict or rebut any part of Brown's testimony. There was furthermore a stipulation that the running board on top of the boxcar on which plaintiff was at the time of the accident was 14 feet 6 inches above the railroad tracks. Plaintiff was 6 feet 2 inches tall.

From the above evidence the jury could infer that the low level of the trolley wires found by Brown four days after the accident had existed at the time of the accident and long before that, since the reconstruction in 1935. The height at which the span wires were attached to the poles, 23 feet 10 inches at the western pole, 24 feet 4 inches at the eastern pole combined with the evidence that such span wires loop down strongly (2 or 3 feet or more at a width of 40 or 60 feet, whereas here the width was 80 feet) and that the trolley wires are still a few inches lower, permitted the jury to draw the inference that from the time at which the span wires were installed on the poles (in 1935) the trolley wires had been down as low as they were found to be after the accident, 19 feet

10 inches for the western trolley wire, 20 feet for the eastern one. These levels leave only clearances of 5 feet 6 inches and 5 feet 8 inches above the running board on which plaintiff was standing, whereas plaintiff is 6 feet 2 inches, circumstances which fully explain the accident which happened.

Appellant is the less in a position to attack the inference that the low level of the trolley wires had existed since their installation, because the city itself expressly took said position at the trial. In his opening statement its attorney said in part: ''The evidence will show that the trolley wires and the span wires . . . are high there, twenty feet above the ground, and the evidence will further show that there was no sagging of the wires, that is the way the wires are constructed back in 1914, and there had been no change in all that time, there had been no sagging.'' Although ''back in 1914'' evidently was a mistake because of the undisputed reconstruction in 1935, it shows that the city was not aware of any recent sagging of the wires but that it ascribed the level of the wires at the time of the accident to the manner of installation as is borne out by the evidence stated before.

Evidently there had existed for many years a defective condition, which the city by simple measuring could and should have discovered and then corrected.

Appellant next urges that even if a defective condition was proved to have existed on December 16, 1948, this would not cause responsibility of the city to the plaintiff because the plaintiff was at most a gratuitous licensee to which the city so far as the condition of the premises was concerned owed only the duty of abstaining from wilful or wanton misconduct, and was under no duty of inspection. This contention is based on the fact that for construction, maintenance or use of a spur track in San Francisco a permit of the board of supervisors is required, which permit must be temporary and revocable at the will of said board (Ordinance 69 (New Series), Def. City's Ex. 3). Under said ordinance said board on July 20, 1910, granted to F. E. Knowles, the then owner of the warehouse at the intersection here involved, permission revocable at will to construct, maintain and operate a spur track from the tracks of ''the Western Pacific Company'' into said property (Ordinance 1255 (New Series), Def. City's Ex. 2). Said ordinance particularly referred to section 8 of Ordinance 69 (New Series), *supra*, relating to the duties of ''the railway operating any spur track on any public street'' (also called ''the operating railway''). On October

13, 1910, Knowles signed an assignment of said permit to Western Pacific Railway Company. ▉ Appellant now intimates that Knowles had no right to assign the permit, that the assignee had no right to operate the spur track and that not Western Pacific Railroad Company, the party to the action below, but Western Pacific Railway Company was the assignee. The argument is frivolous. The ordinance granting the permit shows on its face that, understandably, the intention had always been that a railway company, not Knowles, would operate the spur. The evidence moreover showed that on the ground of the stated assignment the city in 1914 when the streetcar tracks were laid, demanded and received from Western Pacific Railway Company all costs of constructing the crossing of the streetcar and spur tracks, and that thereafter the spur tracks remained in frequent use until the accident. It was further conceded at the trial that until the time of the trial the city had always taxed the Western Pacific as the owner of said spur track. When said concession was made no indication was given that the corporation taxed might be another than the one which operated the spur track on the day of the accident and which was a party to the action. Under these circumstances the city has evidently ratified the assignment and is estopped from urging that operation of the spur track by the Western Pacific Railroad Company was not covered by the permit. If the city had in any way intimated a doubt as to the identity of Western Pacific (which it itself incorrectly called "Western Pacific Company") certainly a showing would have been made that Western Pacific Railroad Company since a reorganization in 1916 was the successor of Western Pacific Railway Company (see Moody's Transportation, 1952, p. 375).

There remains the question whether the fact that the spur track was being operated under the above permit absolved the city from exercising ordinary care in the maintenance of the level of its trolley wires above said spur track. We answer said question in the negative.

▉ The city operates the municipal street railway system in proprietary capacity (*Postal Tel.-Cable Co.* v. *San Francisco,* 53 Cal.App. 188, 190 [199 P. 1108]) and in doing so is normally under duty to exercise the same degree of care and is liable for negligence in the same manner as private corporations (*Peccolo* v. *City of Los Angeles,* 8 Cal.2d 532, 536 [66 P.2d 651]). ▉ "A street railroad company must exercise reasonable care and diligence so to construct and main-

tain its trolley wire as to make it reasonably safe for the passage of persons who have a right to pass under it . . ." (60 C.J. 410). The permit gave the company the right to have its freight cars pass over the spur track so long as the permit was not revoked and the permit even imposed on the operating railway a duty to deliver freight cars of a connecting railway over it. The spur track was in use under said permit when the trolley wires were first installed, had been so in use for more than 20 years when the wires and poles were reconstructed and for more than 35 years when the accident happened. ▉ There can be no doubt that the passage of freight cars at the intersection was as to the city a known and rightful use of the street to which in the operation of its street railway the city had to give full consideration and to which it owed ordinary care not to endanger it. It is irrelevant in this respect whether the ordinance of the city under which the spur track was maintained is labeled a permit or a franchise, both equally mentioned in section 470, Civil Code.

The position of the Western Pacific and of plaintiff as its employee is not the same as that of a simple gratuitous licensee on private property. The rationale of the lesser care due such a licensee is that he is only the recipient of a gift, a favor. (See Rest. Torts, § 342, com. c.) ▉ The city granting the right to construct, maintain and operate a spur track over a public street does not do this as a personal favor but in its governmental capacity in the commercial and industrial interest of the city which is indirectly served by the transportation advantage to the individual plant. Symptomatic in this respect is section 7 of the Ordinance No. 69 (New Series) supra, which reserves to owners or users of adjacent properties or tracks the right to use the spur tracks for which a permit is granted against payment of a proportionate share of the costs. Substantial duties as to maintenance and service are imposed on the operating railway. If the distinction of invitee and licensee is at all appropriate for such special situations the position of the Western Pacific might be considered more like that of an invitee with a right to be on the premises so long as the permit was not revoked. (See Grant v. Sunset Telephone etc. Co., 7 Cal. App. 267 [94 P. 368]; Sills v. Forbes, 33 Cal.App.2d 219, 226 [91 P.2d 246].) ▉ However, we prefer not to apply the distinction at all but to hold in accordance with Fernandez v. Consolidated Fisheries, Inc., 98 Cal.App.2d 91, 95-96 [219 P.2d 73] that under the general provision of section 1714

of the Civil Code appellant was liable for the injury caused by its want of ordinary care, as explained hereinbefore. In the Fernandez case the difficulties and defects of a distinction in required care according to a strict division of the persons to be protected into invitees, licensees and trespassers has recently been vigorously urged by the other division of this court, Presiding Justice Peters writing the opinion. ▆ Certainly where, as here, there are very special relations which cannot with any certainty be brought under either the category of invitee or licensee, the care required should not be decided on the basis of the affixing of an inappropriate label but on the basis of common sense applied to the actual facts. A rule which would deprive any user of public streets on the basis of a required revocable permit of the protection of ordinary care by the city in the maintenance of its streets and otherwise is unacceptable. The city under its police power over its streets may require permits for many uses. (19 Cal. Jur. 75.) Suppose a taxi service was operated under such permit. Would there be any sensible ground for awarding less protection to the user of such a taxi than to the user of a private automobile? Neither can the city be permitted to escape liability here by labeling plaintiff a licensee. Appellant relies mainly on *Sincerney* v. *City of Los Angeles,* 53 Cal.App. 440 [200 P. 380]. The case is distinguishable on its facts because there the accident occurred when the cars of the railway company moving over its private right of way protruded over a sidewalk of the city illegally without any permission. If there is language in that opinion which does not square with our theory it is not binding on us.

Appellant next assigns as reversible error the refusal by the court of an instruction proposed by the city to the effect that defendant company was bound by General Order No. 26D of the Public Utilities Commission prohibiting a railroad corporation from operating cars over tracks on which overhead clearances are less than 22 feet, and the giving of an instruction to the effect that a similar provision did not apply to said defendant. If this was error it was error prejudicial to plaintiff only, who has not appealed. ▆ "The city, as a joint tort feasor, has no legal right to complain that another joint tort feasor was improperly exonerated from liability, there being no right of contribution between joint tort feasors." (*Sullivan* v. *City & County of San Francisco,* 95 Cal.App.2d 745, 755 [214 P.2d 82].) The city contends that it also was prejudiced because if the jury had been instructed

on the above duty of the company not to operate its cars under the existing condition the jury might have found that the negligence of company was the sole proximate cause of the accident, thus exonerating appellant. This is not so. The rules which prohibited the owner of wires from maintaining them with an insufficient clearance above railway tracks and railroad companies from operating cars where there was insufficient clearance were both intended to prevent just such accidents as here happened. Both the city and the railroad company violated these safety rules for many years continuing until the moment of the accident. The negligence of each then constitutes a concurrent cause of the accident. ▮▮▮ ''Where the original negligence continues and exists up to the time of the injury, the concurrent negligent act of a third person causing the injury will not be regarded as a superseding cause; but each of the two concurring acts of negligence will be held to be a proximate cause.'' (*Werkman* v. *Howard Zink Corp.*, 97 Cal.App.2d 418, 426 [218 P.2d 43], and cases there cited.) ▮▮▮ Moreover, ''If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.'' (Rest. Torts, § 449; *McEvoy* v. *American Pool Corp.*, 32 Cal.2d 295, 299 [195 P.2d 783].) The possibility of a car's being driven over the spur track was certainly one of the hazards which made the city negligent in maintaining the wires at too low a level. ▮▮▮ Although in general the reasonable foreseeability of the intervening act is for the jury where there is room for reasonable difference of opinion (Rest. Torts, § 453, com. a; *McEvoy* v. *American Pool Corp.*, *supra*) here there is no room for such difference of opinion as undisputed evidence shows that these acts had openly occurred under a permit of the city daily for many years prior to and until the accident. If appellant was negligent, and it was correctly found to be negligent, its negligence was under these circumstances a cause of the accident as a matter of law. The above shows also that the court's refusal of the city's related proposed instruction No. 33 cannot have been prejudicial to the city.

▮▮▮ There was no error in the refusal of instructions as to absence of negligence in the use of appliances not obviously dangerous, used safely and without accident for a long time

by a defendant who had no reason to know of any danger, because the known danger of impaired clearances, which led to rules as to minimum clearances recognized as applicable by the city, imposed on the city the duty of reasonable inspection (38 Am.Jur. 667), and the simplest inspection by measuring would have shown the dangerous condition which existed for many years, so that the city as a matter of law was not in the position of somebody who had no reason to know of the danger. The city can be said to have had constructive knowledge. (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 206 [157 P.2d 625, 158 A.L.R. 625] ; *Perry* v. *City of San Diego,* 80 Cal.App.2d 166, 170 [181 P.2d 98].)

▮ Appellant points out that it was error to instruct on the requirements of General Order 95 of the Public Utilities Commission because that order, effective July 1, 1942, contained a provision that its requirements do not apply to lines constructed or reconstructed prior to its effective date, the line involved having been constructed in 1914 and reconstructed in 1935. The error was not prejudicial because the provisions stated to the jury as applicable as part of said ordinance were at any rate applicable to the city under the general law except a provision requiring *frequent* inspections of the line and one requiring a minimum clearance of 22 feet. The latter was concededly applicable to the city on the basis of other orders of the Public Utilities Commission, the former was not prejudicial because the city, which as stated before was under duty of *reasonable* inspection, had necessarily violated that duty, as one inspection by simple measuring would have shown the defect.

Appellant further complains that the court erroneously rejected the city's evidence relative to the reconstruction of the overhead system in 1935 by a contractor under contract with the State of California which contract required the work to be done conforming to the requirements of the California Railroad Commission. The materiality is not obvious as the amended complaint predicates the city's liability on the fact that it negligently owned, operated, maintained and controlled the wires at too low a level, not that it so constructed them. The only ground for materiality submitted by the city at the trial was that the reconstruction in the stated manner might constitute an excuse for the maintenance and operation of the wires by the city in violation of an order of the Railroad Commission. ▮ As reliance on the correct execution of the work by the contractor, whether contractor of the city or

of the state, would not constitute an excuse for operation and maintenance without any inspection during many years when a simple one time measuring would have shown the defect, this only ground of materiality proposed was correctly rejected. The same ground is not repeated on appeal. ▮ Other grounds of materiality proposed on appeal need not be reviewed, as appellant cannot complain that grounds of admissibility were not accepted which were not stated in the court below. (*Valentin* v. *Valentin*, 93 Cal.App.2d 588, 593 [209 P.2d 654]; *Estate of Parkinson*, 190 Cal. 475, 477 [213 P. 259].)

Prejudicial error is predicated on the court's allowing Dr. Catton to testify although when the city had tried to take Dr. Catton's deposition plaintiff had successfully interposed the claim of the attorney client privilege because Dr. Catton was an intermediate agent for communication between plaintiff and his attorneys. (*City & County of San Francisco* v. *Superior Court*, 37 Cal.2d 227, 234 et seq. [231 P.2d 26, 25 A.L.R.2d 1418]. ▮ The contention, not supported by any authority, has no merit. An attorney, or a person in a similar position, is not incompetent to testify in the case of his client, and does not become incompetent for the future, when the privilege is asserted. ▮ The privilege may be waived by the person in whose favor it exists at any time, and only thereafter is the testimony of the witness also available to the opposing party. Accordingly Dr. Catton was cross-examined at length.

With respect to the several assignments of error stated before, it may be added that if with respect to any of them there has been some error, it has not resulted in a miscarriage of justice as appellant under all circumstances shown by the evidence should clearly be held liable for the negligent maintaining of its wires. (Cal. Const., art. VI, § 4½.)

▮ Finally appellant contends that the damages in the amount of $7,500 granted are excessive as a matter of law. Appellant does not give an analysis of the evidence supporting the award, but mainly contends that there were no special damages, that the physical injury plaintiff suffered was slight, that he was never confined to bed, that most of his complaints were subjective in character, and that his lower earnings were mainly attributable to slackness of times for the railroad, low seniority and plaintiff's turning to office work, which he preferred.

Plaintiff's medical expenses were paid under an insurance policy of his employer. The evidence favorable to respondent shows in part the following: Plaintiff when hit by the wire over the bridge of his nose was only knocked out for a moment and was soon able without assistance to get up from the top of the car, set the brake and to come down. A physician applied some methylate to his face and he then continued to work and even worked a second shift that day. However at the end of the day his eyes were swollen, his neck was stiff and he had a severe headache. The trouble with neck and headache kept him from work for the next two days and also later prevented him from working double shifts and a few times from working at all. There was a definite sprain of the neck. An X ray taken just before the trial showed a minute calcium deposit in the neck which had not been present on X rays taken shortly after the accident, which new deposit was explained by one expert witness as corroborating that a ligament had there been actually sprained. Except for that little deposit there was no objective indication of disability at the time of trial. Dr. Catton who examined plaintiff a week after the accident saw symptoms as of shingles on left arm and chest, according to said witness attributable to damage to nerves and ganglia in the accident. Early in January a feeling of weakness in the left shoulder developed; plaintiff felt he could not hang onto the side of a freight car and had difficulty throwing a switch. Other nervous symptoms also developed over and above the severe headaches and stiffness of the neck; restlessness, sleeplessness and fear of dying, for which a few times a doctor had to be called in the night. The diagnosis was, according to Dr. Catton, traumatic neurosis of the anxiety type. There was no indication of malingering or of a litigation neurosis, but of a traumatic neurosis on the basis of physical injury. Physical therapy for the several symptoms did not yield sufficient results. In April, 1949, plaintiff was forced to give up his work as a switchman and later he was notified by the Western Pacific that his services were no longer needed because he did not report to work. Two physicians testified that in his condition it was not safe for him to do switch work. At the time of the trial, nearly three years after the accident, the several symptoms had decreased but not disappeared, and they were not expected to disappear completely. Since his dismissal appellant had done different kinds of work among which was work as a warehouseman; because of inability to handle heavy tires

he transferred to a desk job with the same firm which paid $30 a month less than he received as warehouseman. If he had stayed with the Western Pacific he would in two years have attained regular status and earned $15.64 per day. His salary at the time of the trial amounted to $200 a month.

Traumatic neurosis was recognized in this state as a basis for damages as early as 1896. (*Sloane* v. *Southern Calif. Ry. Co.*, 111 Cal. 668, 680 [44 P. 320, 32 L.R.A. 193].) There was here evidence of physical injury, long and severe mental suffering, loss of a job, loss of income, and loss of earning capacity by restriction of the kind of work for which respondent was fit. He had a life expectancy of 40 years. Under these circumstances we cannot say that the recovery of $7,500 shocks the sense of justice and raises at once a presumption that it is the result of passion or prejudice, the degree of evident excessiveness required according to the rule in this state to permit an appellate court to set aside a damage award. (8 Cal.Jur. 834.)

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied February 18, 1954, and appellant's petition for a hearing by the Supreme Court was denied March 17, 1954. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.