[Civ. No. 197.    Fifth Dist.    Apr. 1, 1963.]

GORDON H. BALL, INC., Plaintiff and Appellant, v. JOHN PARREIRA, JR., Defendant and Respondent.

698

Harold J. Scott for Plaintiff and Appellant.

Joseph J. Lebeda for Defendant and Respondent.

CONLEY, P. J.—On a Friday afternoon Wayne Haapala, a construction superintendent of Gordon H. Ball, Inc., a corporation, was flying in its 1956 Cessna Model 182 airplane from Oakland to Three Rivers when he was forced to make a landing near Atwater due to the exhaustion of his fuel or because of some defect in the plane. He attempted to land at the airport, but by mischance crashed in a neighboring oat field, which constituted part of defendant's farming property. The nose wheel of the plane was torn off, and the craft came to rest on its back after the emergency landing.

Fortunately, the pilot was not injured, and he walked off of the field without talking with the defendant. The plane was outfitted with valuable navigating and operational equipment including a clock, Narco Omnigator, a Narco Simplexer and Power Pack, an ADF power supply amplifier and a battery, all of which were alleged to be of the value of $1,993.45.

Mr. Haapala went on to his home at Three Rivers that night, but flew back the next day with one Norsigian, whose business at the Fresno Air Terminal included the preservation and recovery of crashed planes. The two examined the overturned aircraft, decided that it would have to be disassembled in order to move it, took the battery out and laid it on the ground, noted that all of the other items of navigating equipment were still present in the plane and returned to Fresno. Mr. Norsigian testified that the field in which the plane was left was muddy and that the airplane could not be removed unless it were dismantled.

On the next day, Sunday morning, Mr. Norsigian and one Cliff Bryant, a Deputy Sheriff of Fresno County who was not on duty and merely accompanied Mr. Norsigian as a friend, went to the ranch and told Mr. Parreira that he had been authorized by the insurance company to pick up the plane. Norsigian talked to defendant's brother, who com-

plained that other aircraft had previously crashed on the ranch and had done a lot of damage for which no payment had ever been made. Bryant spoke up and said that he was from the sheriff's office at Fresno. Thereafter, defendant came to Norsigian's car and refused to permit them to take the plane; the debate became acrimonious, and Parreira and Bryant engaged in a fist fight. The defendant himself developed the facts as follows:

"A. Well, my brother—first my brother called me up to the house and told me, he said, 'There is someone here to take the plane.' So I went down there and when I got there this fellow was arguing with my brother and so my brother said, 'Well, here is my brother, you talk to him.' So I asked the fellow, I said—if he was the owner of the aircraft and he says, 'No.' I asked him who is the owner of the aircraft and he said Gordon Ball and I said, 'Is Gordon Ball here?' And he said, 'No, sir.' And I asked him—I says, 'Is the Civil Aeronautics guy around?' 'No, sir.' 'Insurance man?' 'No, sir.' I said, 'There is some damages here, who are going to pay for them?' He said, 'Gordon Ball.' And so I asked him, I says, 'Well, how do I know that I am going to get my money for damages here if somebody doesn't sign something or say something to the owner of the aircraft?' He said, 'Well, I am a Deputy Sheriff and I was told to come and get the aircraft.' Him and a couple of other fellows—his mother and father was there. And he said that he was told to pick the aircraft up and I asked him if he had any written statement or anything from Gordon Ball. No, he didn't. He was a Deputy Sheriff. And all this time he had his badge open, his wallet open and his badge showing. He kept insisting that he was a Deputy Sheriff and I told him, I says, 'Are you from Fresno or from here?' And he said, 'From Fresno.' And I said, 'You have no jurisdiction in here whatsoever, you have got no written statement here saying that you could take the aircraft or anything.' I asked him three or four times in a good way to leave the premises and to go get someone that had something to do with the aircraft, insurance man, Civil Aeronautics, or Gordon H. Ball, and they could take the aircraft. About that time he was getting hot because he was a Deputy Sheriff and wanted me to know and I said, 'That don't mean nothing here. You are out of your jurisdiction and you have nothing here with that badge, that means nothing.' About that time he grabbed me by the wrist and started shaking me around and we ended up in a fight. So—

"

. . . . . . . . . . . .

"Q. So in your conversation with him you told him that you wouldn't let him take the plane until he showed you authority or provided for the damages, is that right? A. That is right.

"Q. Had this been a matter that you and your brother had discussed, or what? A. Yes—well, should I say that?

"Mr. MacNicol: Just answer his question. A. Yes, it was.

"Mr. Schlageter: Q. And what was it? What conclusion did you come to, both you come to by reason of this conversation? A. Other aircrafts had fell there and they have always either had the Civil Aeronautics there or insurance man, and on this case there was none.

"Q. But you had decided, had you not, that you wouldn't release the airplane to anyone until—until provision had been made for the damages, is that right?

"Mr. MacNicol: Plus Ball's authorization. A. Plus Ball's authorization that them people were to take the aircraft. I mean we would not have objected at no time if Gordon Ball himself personally or a written deal from him or anything that would have assured us that Gordon Ball was the owner and that somebody was going to pay for damages."

Norsigian then went to Merced and returned with the Merced County Sheriff. The defendant, at the sheriff's request, permitted Norsigian to remove and take certain parts of the plane. On the following Tuesday a person authorized by the insurance company came to the ranch from San Jose and, there having been an undertaking to pay defendant his damages, he was permitted to remove the aircraft. In the meantime, however, the valuable equipment which had been attached to the plane had disappeared.

No one had hired a guard or watchman to take care of the aircraft; it was left in the field; numerous persons, known and unknown, visited the scene of the crash from the time it occurred until the removal of the plane by the plaintiff's authorized representative. One of plaintiff's witnesses testified that it was not customary to post guards or watchmen at wrecked planes.

The propriety of the decision of the trial court must be tested by the stringent rules relating to nonsuit.

■ "The general rule governing nonsuits is that a motion therefor presents a pure question of law, and may be granted only when disregarding all conflicting evidence and accepting plaintiff's evidence at its full value, herein indulging in

plaintiff's favor every legitimate inference which may be drawn from the evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in plaintiff's favor, if such a verdict were given.'' (*Carey* v. *City of Oakland,* 44 Cal.App.2d 503, 509 [112 P.2d 714].)

■ In passing on a motion for nonsuit the trial court must assume for the purpose of deciding the question that every item of evidence which favors the plaintiff and which is not inherently improbable is true, and this requirement extends to every inference which is fairly deducible from the evidence and every presumption favoring the plaintiff.

(See also *Downey* v. *Martin Aircraft Service, Inc.,* 96 Cal. App.2d 94, 97 [214 P.2d 581] ; 16 Cal.Jur.2d, Dismissal, Discontinuance, and Nonsuit, § 45 et seq., p. 208 et seq.)

■ When the airplane first landed in the oat field and flipped over on its back, the defendant was not by that fact alone subjected to any liability for its safekeeping. ■ At that moment, although plaintiff's employee entered upon defendant's land without his permission, the pilot was not performing an illegal act, because he was making a forced landing (Pub. Util. Code, § 21403, subd. (a)) ; the plaintiff and the pilot, however, did become responsible to the defendant under the cited section for any damage caused thereby.

■ Appellant relies in part upon sections 1815 and 1816 of the Civil Code relating to involuntary deposit. Each of those sections presupposes the express or implied acceptance of the personal property involved in order to make a depositary liable for its care. The adjective ''involuntary'' qualifying the word ''deposit'' in sections 1815 and 1816 of the Civil Code involves an assumption that the deposit is involuntarily made rather than involuntarily received. The case of *Copelin* v. *Berlin Dye Works & Laundry Co.,* 168 Cal. 715, 721 [144 P. 961, L.R.A. 1915C 712], recognizes this fact. Even though it is said that these sections of the Civil Code ''modify'' the common law rule of nonliability of an involuntary bailee, it seems clear from the later statement in the paragraph ''. . . there was no evidence that defendant's servants were authorized or directed to accept on behalf of their master the care and custody of property left in the clothing which they might handle in the course of their employment,'' that there must be some consensual act in connection with the possession of the personal property leading to a duty to exercise reasonable care with respect to it. In that action expen-

sive jewelry was inadvertently left in clothing sent to a cleaner, the jewelry was stolen, and the Supreme Court held that there was no liability on the part of the defendant cleaning works due to the fact that the woman who sent the clothes to the cleaners without checking their contents was negligent and the legal principle that an employer is not liable for dishonest acts of his employee not done in the course and within the scope of the employment.

██ ██ The question arises whether or not the defendant by preventing the representatives of the plaintiff from entering his land on the Sunday following the crash and by declaring that he was holding the plane until he could secure damages thereby created a bailment. Defendant had the right to a lien for ". . . the storage . . . or safekeeping. . ." of the aircraft (Code Civ. Proc. § 1208.61), but one who holds possession of personal property while claiming a lien upon it is normally a bailee.

██ In *H. S. Crocker Co., Inc.* v. *McFaddin*, 148 Cal.App. 2d 639, 644 [307 P.2d 429], it is said: "The general rule that the assent of both parties is necessary before a contract, either express or implied in fact, can come into existence, is applicable to the ordinary case of a contract of bailment. (7 Cal.Jur.2d 618, § 3; 8 C.J.S. 222, § 1; 6 Am.Jur. 177, § 4.) ██ The duties and obligations of a bailee ordinarily cannot be thrust on one against his consent—they must be voluntarily assumed as in every obligation founded on contract."

In 8 Corpus Juris Secundum, Bailments, section 15b, page 364, the rule is thus stated: ". . . the duties and responsibilities of a bailee cannot be thrust on a person without his knowledge or consent, or against his protest, and the bailee must have voluntarily assumed custody and possession of the property."

██ In the same section of 8 Corpus Juris Secundum, at page 365, it is pointed out: "It is not requisite that the acceptance be actual; one that is constructive or implied is sufficient, as where a person comes into actual possession and control of a chattel fortuitously or by mistake, or takes possession of goods left rightfully in a place by their owner, and removes them to another place. Ordinarily, knowingly taking property into possession or control is a sufficient acceptance and may be sufficient to establish an implied bailment, but in order to have that result the delivery must be made for the purpose of creating a bailment. Acceptance will not be inferred unless there is something to show notice or knowledge

on the part of the alleged bailee that the goods are in fact in his possession, and that they are the property of the bailor.''

In *Bank of America* v. *Taliaferro,* 144 Cal.App.2d 578, 583 [301 P.2d 393], it was held that a landlord who moved the refrigerator of a former tenant to a different part of the building for the purpose of storing it thereby became a bailee of the property. And a shop was held liable for the loss of a brooch attached to a customer's dress which was taken by employees from a dressing room to another part of the premises in *Fuller* v. *I. Magnin & Co.,* 104 Cal.App.2d 517 [232 P.2d 36].

It appears to us that by his refusal to permit the removal of the airplane until his damages were paid, the defendant could be found to have created a bailment for the mutual benefit of the plaintiff and himself.

As is said in 8 Corpus Juris Secundum, Bailments, section 27(1), page 401: ''Where a bailment is for mutual benefit, the bailee, in the absence of special contract, is held to the exercise of ordinary care in relation to the subject matter thereof and is responsible only for what has been termed ordinary negligence. As stated by some courts, the bailee must exercise reasonable care and diligence, or due care and diligence.'' (See *Continental Mfg. Corp.* v. *Underwriters at Lloyds London,* 185 Cal.App.2d 545, 549-550 [8 Cal.Rptr. 276, 9 Cal.Rptr. 115]; *Travelers Fire Ins. Co.* v. *Brock & Co.,* 30 Cal.App.2d 112, 114 [85 P.2d 905]; *Beetson* v. *Hollywood Athletic Club,* 109 Cal.App.715, 718 [293 P. 821]; *Baxter* v. *Shanley-Furness Co.,* 193 Cal. 558, 561 [226 P. 391]; *Crescent Bed Co.* v. *Jonas,* 206 Cal. 94 [273 P. 28].)

Sufficient prima facie showing of liability was made under the pleadings in this case by proof of the bailment and the subsequent failure of the bailee on demand to make delivery of the property. This cast upon the defendant the burden of explaining such failure by showing that the property was stolen or otherwise disposed of by others without negligence on his part, and such proof had not been made at the close of plaintiff's case when the motion for nonsuit was granted. (*Cussen* v. *Southern Cal. Sav. Bank,* 133 Cal. 534, 537 [65 P. 1099, 85 Am.St.Rep. 221]; *Dieterle* v. *Bekin,* 143 Cal. 683, 688 [77 P. 664]; *Greer* v. *Los Angeles Athletic Club,* 84 Cal.App. 272, 283-284 [258 P. 155]; *Ferguson* v. *Green,* 99 Cal.App. 641, 643 [278 P. 1058]; *Wilson* v. *California Central R. R. Co.,* 94 Cal. 166, 172 [29 P. 861, 17 L.R.A.

685] ; *U Drive & Tour, Ltd.* v. *System Auto Parks, Ltd.,* 28 Cal.App.2d Supp. 782, 784-785 [71 P.2d 354].)

Considered in the light of the technique required for ruling on a motion for nonsuit, the record shows that the defendant assumed the position of a bailee by excluding the plaintiff's representative from his real property and refusing to release the aircraft until payment of his damages should be satisfactorily undertaken; that the defendant thereby assumed the duty to exercise reasonable care for the safekeeping of the plane and that as the burden of proving that he was not negligent shifted to defendant, the motion for a nonsuit should have been denied.

The judgment is reversed.

Brown (R. M.), J., and Stone, J., concurred.