[Civ. No. 180.   Fifth Dist.   Aug. 5, 1963.]

W. E. McCALL, Plaintiff and Appellant, v. OTIS ELEVA-
TOR COMPANY et al., Defendants and Respondents.

24

Kane, Canelo & Mash, A. B. Canelo, Cyril Viadro and Guernsey Carson for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Colye & Best and William B. Boone for Defendants and Respondents.

CONLEY, P. J.—The plaintiff, W. E. McCall, was seriously injured when he fell down a shaft for an elevator installed by Otis Elevator Company in a hospital annex being constructed by Harris Construction Company. At the end of a five-day trial the court granted defendants' motion for a nonsuit. ■■ The plaintiff was denied a new trial, and an appeal was filed as to the entire judgment for both defendants. However, in his briefs the plaintiff directed the appeal against Harris Construction Company only, and says nothing against the judgment in favor of the Otis Elevator Company; affirmance as to the latter will necessarily follow.

■■ As is said in *Gordon H. Ball, Inc.* v. *Parreira,* 214 Cal.App.2d 697, 701-702 [29 Cal.Rptr. 679] : "The propriety of the decision of the trial court must be tested by the stringent rules relating to nonsuit.

" 'The general rule governing nonsuits is that a motion therefor presents a pure question of law, and may be granted only when disregarding all conflicting evidence and accepting plaintiff's evidence at its full value, herein indulging in plaintiff's favor every legitimate inference which may be drawn from the evidence, the result is a determination that

there is no evidence of sufficient substantiality to support a verdict in plaintiff's favor, if such a verdict were given.' (*Carey* v. *City of Oakland,* 44 Cal.App.2d 503, 509 [112 P.2d 714].)

"In passing on a motion for nonsuit the trial court must assume for the purpose of deciding the question that every item of evidence which favors the plaintiff and which is not inherently improbable is true, and this requirement extends to every inference which is fairly deducible from the evidence and every presumption favoring the plaintiff.

"(See also *Downey* v. *Martin Aircraft Service, Inc.,* 96 Cal.App.2d 94, 97 [214 P.2d 581]; 16 Cal.Jur.2d, Dismissal, Discontinuance, and Nonsuit, § 45 et seq., p. 208 et seq.)"

On an appeal from a judgment of nonsuit the usual rules establishing the technique for the examination of the record and the decision of the case are vitally changed. In the normal appeal in a completely tried case, every intendment is in favor of the judgment, and the inquiry made by the appellate court is normally restricted to the question whether there is any substantial evidence to support the verdict or the findings of the court below. But when the appeal is from a judgment of nonsuit, the appellate court inquires, rather, whether there is substantial evidence in the record which, if believed by the finder of fact, would justify a judgment in favor of the plaintiff, and if the answer to this inquiry is affirmative, the judgment of nonsuit must be reversed. The rationale of this change of rule is obvious. It is the intention of the law that the jury, or in the absence of a jury, the court, as finder of fact, is entitled to pass upon the whole record, except in those relatively rare cases where, as a matter of law, the plaintiff has not made out a case and would not be entitled to a judgment in his favor.

Defendant Harris Construction Company contracted with the Sisters of Mercy Hospital in Merced to construct a new annex on 28th Street, next to the old hospital, which fronted on M Street. Cyrk Stiles, job superintendent for the Harris Construction Company, was in charge of the work. Defendant Otis Elevator Company had the subcontract for the elevators; one shaft was bricked up; one elevator was in operation on February 19, 1960; the first floor corridor was covered with asphalt tile and was lighted. The inside of the shaft was gray concrete. The distance between floors is 12 feet, with a 5-foot pit below the basement level. There was no light in the bottom of the elevator pit, and no light in

the elevator shaft except the small amount that "leaked" around the inside of the elevator itself from the floor above.

Charles Boyles, Otis' mechanic, installed the elevator; as is customary, when it became operable, though not finished, the subcontractor permitted the general contractor to use it as a construction elevator. Harris Construction Company, through Stiles, signed a form, "Temporary Acceptance" agreement, which required Harris to supply an operator for the elevator; this was not done. Boyles later returned to install walls, ceiling, floors, and fixtures in the elevator, leaving November 1959, planning to return February 28, 1960, when the third floor work would start.

Oits Elevator Company had blocked open the doors attached to the car so that they could not be used. The "hoist way" doors, fastened to the building, not the car, will be called "elevator doors"; at that time there were five; the first and second floors had doors at either end of the shaft; at basement level there was only one door. All doors were designed to close by themselves because of a spring mechanism, and the doors locked by means of a dagger traveling between two rollers and catching on a keeper. When not held open, the doors automatically closed and locked so long as the closures were not fastened back or the rollers tied off. If the locking mechanism was disconnected, by tying the rollers and preventing the dagger from catching the keeper, and if the closure mechanism was operating, a door almost fully closed but did not lock; it remained open a crack and could be further opened by inserting one's fingers and sliding the door back; this was the situation as it existed on the day of plaintiff's accident.

The call buttons were not in service. The elevator could be brought from one floor to another only by operating it from within the car; if a door locked, it was impossible to open it from the outside except the basement door where there was a "key." If a door slammed shut, Stiles would have to go to the top, "shinny" down the greasy cable and into the car through a trap door.

Before leaving the job, Boyles told Stiles to control the door at the desired floor by inserting a stick about 42 inches long, an inch wide and a half-inch thick in the track along the floor, which would hold the door open. The stick was to be kept in the car. If the stick was removed and the door allowed to close, it would lock and could not be opened from the outside.

When Boyles left in November 1959 the elevator was operating, and the doors had the spring tension against them which caused the doors to lock in accordance with their normal design. The elevator was in constant use, and Stiles "tied the door off" for convenience. On February 17, 1960, two superintendents of the Otis Elevator Company inspected the premises and found that the doors were tied off. They promptly removed the springs from behind the enclosures and untied the rollers on all floors to eliminate the hazardous condition. They expressly told Stiles that such tampering by him had created a dangerous condition.

After the two Otis Elevator Company employees left, Stiles took it upon himself, contrary to their express warning, again to tie off the door on the first floor, the one through which plaintiff McCall later fell. No warning signs were posted, and no barricades were erected at the door during its daily use.

Plaintiff, 52 years and 11 months old at the time of the fall, was in good health and was working for the Sisters of Mercy Hospital as a custodian. Such work occasionally required him to go to the annex. His employers had the right, as owners of the property, and also by express agreement with Harris Construction Company, to use parts of the annex in the course of construction for the storage of property for future use in the hospital operations. On one prior occasion plaintiff McCall had helped move T.V. sets into the annex; this required several trips up and down in the elevator; Mr. Hinkle, maintenance engineer for the new annex, operated the elevator on that occasion, and plaintiff did not run the mechanism of the elevator. On another previous occasion plaintiff helped move X-ray equipment into the new annex; a man named Adams then helped plaintiff and a worker at the new annex ran the elevator; again, plaintiff McCall did not manipulate any of the mechanical parts.

On February 19, 1960, Sister Joseph told plaintiff to take a desk over to the new building for use by Mr. Hinkle in his office in the basement of the annex. He moved the desk outside of the old building on a truck. From this point, plaintiff remembers little or nothing at all, except that he remembers falling through space, and recalls hearing a fellow employee, Herman Barker, call to him at the bottom of the elevator pit after his fall. According to the testimony of Stiles, plaintiff and Sister Joseph were moving the desk when Stiles told them to take it down the chute, because new

tile had been laid in the corridor, and he feared the heavy load would cause the tile to "pop loose." Mr. Barker, also employed by the Sisters of Mercy Hospital, and Hinkle, came to help plaintiff; they headed for the chute, which was an outside ramp. Hinkle correctly pointed out that the desk was too large to go down the chute, and suggested the use of the elevator. The group of workmen proceeded into the hall leading to the elevator. Hinkle walked ahead; Barker brought the dolly with the desk on it, and plaintiff walked somewhere behind the other two. They passed Stiles, who was eating his lunch in a little alcove off the hall; Stiles, who was facing them, said nothing as they passed, though he saw them and what they were doing. When the elevator was reached, Hinkle opened the door about 1 foot to 18 inches, found that the car was not there, and said to Barker that he would go upstairs, get the elevator and bring it down. When he left, the elevator doors closed further. Barker put the dolly into position in front of the elevator, looked up and then saw plaintiff falling down the open shaft. Plaintiff's back, hip and pelvis were broken.

■ A preliminary question always necessary to answer in a tort case specifically or by implication is whether there was any duty of care owed by the defendant to the plaintiff. Much time was consumed during the argument of the motion for nonsuit and considerable space is devoted in the briefs to an attempt to classify the plaintiff either as an invitee or licensee. This time was largely wasted in view of the comprehensive holding in *Chance* v. *Lawry's, Inc.*, 58 Cal.2d 368 [24 Cal.Rptr. 209, 374 P.2d 185], that in an action of this kind where a person is properly in the location where the accident happens there is a duty of due care on the part of one in the position of an independent contractor toward such person. It really makes little difference whether the plaintiff is then called an invitee or a licensee, or neither.

■ On page 376 of the opinion it is said:

"It is clear that, where an independent contractor exercises control over the owner's premises, his duty of care toward third persons is commensurate with that of the owner (see *Coggins* v. *Hanchette*, 52 Cal.2d 67, 74 [338 P.2d 379]; *Donahoo* v. *Kress House Moving Corp.*, 25 Cal.2d 237, 243 [153 P.2d 349]) especially where the plaintiff is the employee of a subcontractor (*Florez* v. *Groom Development Co., supra,* 53 Cal.2d 347, 354 [1 Cal.Rptr. 840, 348 P.2d 200]; *Revels* v. *Southern Cal. Edison Co., supra,* 113 Cal.App.2d 673, 677

[248 P.2d 986]). In other cases his duty of care is said to be that of a licensor (*Allen* v. *Jim Ruby Constr. Co.*, 138 Cal. App.2d 428 [291 P.2d 991]) or is 'analogous' to that of an invitor (*Garner* v. *Pacific Elec. Ry. Co.*, 202 Cal.App.2d 720, 727 [21 Cal.Rptr. 352]). The exact duty of care imposed on an independent contractor varies with the seemingly endless combinations of relationships possible and cannot be defined by any general formula.''

The court makes it clear at page 377: ''Justice will not be served by trying to fit each case involving an independent contractor into a Procrustean bed bounded by the concepts of 'invitee' at the head and 'licensee' at the foot.''

The opinion continues as follows at pages 377-379: ''The liability of an independent contractor to one not a party to his contract 'is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the policy of preventing future harm.' (*Stewart* v. *Cox*, 55 Cal.2d 857, 863 [13 Cal.Rptr. 521, 362 P.2d 345]. See also *Garcia* v. *Soogian*, 52 Cal.2d 107, 110 [338 P.2d 433]; *Fernandez* v. *Consolidated Fisheries, Inc.*, supra [98 Cal.App.2d 91 (219 P.2d 73)]; *Hession* v. *City & County of San Francisco*, supra [122 Cal.App.2d 592 (265 P.2d 542)]; Prosser, Torts (2d ed. 1955) § 36, p. 167.)

''On several occasions the courts of this and other states have defined the independent contractor's duty to third persons without regard to the legal classifications of 'invitee,' 'licensee' and 'trespasser.' In *Donnelly* v. *Hufschmidt*, 79 Cal. 74 [21 P. 546], a repairman, hired by the lessor, was held liable when a tenant tripped over a box of tools which had been left in the passageway. The court said (at pp. 75-76) 'Nor can it be held that the defendants owed no duty to the plaintiff. The defendants were bound so to exercise their rights as not to interfere with the rights of others. [Citation.] They owed the duty to the plaintiff to do her no injury in the employment of their own legal rights.' (See also *Burke* v. *Zanes*, 193 Cal.App.2d 773 [14 Cal.Rptr. 619], following *Donnelly* v. *Hufschmidt, supra*.)

''In *Hall* v. *Barber Door Co.*, 218 Cal. 412 [23 P.2d 279], an independent contractor hired by the landlord was held

liable for injuries caused by a falling door which the contractor had improperly installed. Defendant claimed that he had no duty of care toward the plaintiff, who was a tenant of the landlord. This court said, 'It cannot be doubted that an independent contractor is responsible to an occupant of a building rightfully on the premises at the request or consent of the owner for any wrongful acts that may be committed by himself or his employees while the stipulated work is in progress and resulting in injuries to such occupant. The ground upon which this liability is based is the implied duty which the law casts upon the independent contractor, as the person in charge and control of the work, to see that the rights of other persons, rightfully on the premises, are not injuriously affected by the performance of the work. [Citations. . . .] Upon both principle and authority, it is clear that an independent contractor, who by his own negligence creates dangerous conditions during the progress of the work, should be held responsible for an injury occasioned by those conditions to one rightfully on the premises, and should be held liable for damage directly attributable to the failure to perform this duty.' (218 Cal. at p. 419.)

▌ "The independent contractor's duty of care was succinctly stated by Denning, Lord Justice, as being 'a general duty imposed by law to use reasonable care to prevent damage to persons whom he may reasonably expect to be affected by his work. . . . The cases show, moreover, that the duty of care is owed to all those whom the contractor may reasonably expect to be affected by his work, whatever the capacity in which they come, whether as invitees or licensees or as other contractors. . . .' (*Riden* v. *A. C. Billings & Sons, Ltd.* [1956] 3 All E. R. 357, 361. See also Civ. Code, § 1714; *Handley* v. *Capital Co.*, 152 Cal.App.2d 758 [313 P.2d 918]; *Kimber* v. *Gas Light & Coke Co.* [1918] 1 K.B. 439, 447 ['It is A.'s duty to carry on his work with due precautions for the safety of those whom he knows, or ought reasonably to know, may be lawfully in the vicinity of his work. . . .']; *Bacak* v. *Hogya*, 4 N.J. 417 [73 A.2d 167, 170] ['An independent contractor hired by an owner of lands to do work thereon is under a legal duty to exercise ordinary care to render the premises safe for persons lawfully on the premises. . . .']; *Hickman* v. *Parks Constr. Co.*, 162 Neb. 461 [76 N.W.2d 403, 409, 62 A.L.R.2d 1040]; *Crane Elevator Co.* v. *Lippert*, 63 F. 942, 947 [11 C.C.A. 521].)"

▌ Would the evidence before the jury have permitted

it to find that the Harris Construction Company was guilty of negligence which proximately caused the injury to plaintiff? The answer is convincingly "yes."

The Otis Elevator Company superintendents warned Mr. Stiles, of the Harris Construction Company, to maintain certain safety devices on the elevator; Stiles deliberately carried on operations, not only without the use of these safety devices, but after he had eliminated them by positive action on his part; the result was that the elevator and its shaft constituted a kind of trap for anyone whose employment required his presence on that part of the premises. ■ "An elevator is a dangerous instrumentality, unless properly managed; . . ." (*In re Stone*, 48 Cal.App. 463, 465 [192 P. 71].) ■ No warning signs were exhibited, no barricades were in place, and no elevator operator was on duty as required at least by the contract between the Otis Elevator Company and the Harris Construction Company.

■ The maintenance of a "trap" is a recognized basis for the successful prosecution of a claim for injury even by a licensee. As is said by Prosser on Torts (2d ed. 1955) page 449: "Another exception which developed quite early was that the occupier was not permitted to 'set a trap' for the licensee. While this phrase originally was used in the sense of presenting an appearance of safety where it did not exist, the significance which finally became attached to it was not one of intent to injure, or even of active conduct, but was merely that the possessor of land was under an obligation to disclose to the licensee any concealed dangerous conditions of the premises of which he had knowledge. The theory usually advanced in support of this duty is that by extending permission to enter the land he represents that it is as safe as it appears to be, and when he knows that it is not there is 'something like fraud' in his failure to give warning. The licensee may be required to accept the premises as the occupier uses them, but he is entitled to at least equal knowledge of the danger, and should not be expected to assume the risk of a defective bridge, an uninsulated wire, an unusually slippery floor, or a dangerous step, in the face of a misleading silence."

*Hall* v. *Barber Door Co.*, 218 Cal. 412, 420 [23 P.2d 279], involved a door to a stall in a produce terminal which had been hung by the defendant contractor with incomplete installation. No further work had been done on the door at the time plaintiff raised it to leave and he was injured when

it fell upon him. Defendant knew that the set-screws had not been countersunk. The court said: "The jury could also have found that as left by defendant the door was a dangerous instrumentality within the meaning of that doctrine as recently enunciated by this court in *Dahms* v. *General Elevator Co., supra* [214 Cal. 733 (7 P.2d 1013)], and that as constructed and left by defendant, it was in legal effect a trap of the existence of which it was defendant's duty to warn even licensees." (See also *Donahoo* v. *Kress House Moving Corp.,* 25 Cal.2d 237, 245-246 [153 P.2d 349].)

The trial judge seemed to believe that contributory negligence was an additional ground justifying the granting of the motion for nonsuit. The general rule with respect to a nonsuit on the ground of contributory negligence is well expressed in *Lokey* v. *Pine Mountain Lumber Co.,* 205 Cal.App.2d 522, 529-530 [23 Cal.Rptr. 293]:

"As stated in *Atherley* v. *MacDonald, Young & Nelson,* 142 Cal.App.2d 575, 585 [298 P.2d 700]: '. . . It is a rare case in which it can be said that the plaintiff is guilty of contributory negligence as a matter of law. Normally, of course, this defense is one of fact for the trier of the fact. "Where different conclusions may be reasonably drawn by different minds from the same evidence, the decision must be left to the jury." (*McStay* v. *Citizens Nat. T. & S. Bank,* 5 Cal. App.2d 595, 600 [43 P.2d 560]; see also *Rau* v. *Redwood City Woman's Club,* 111 Cal.App.2d 546 [245 P.2d 12].) It is of course true that a plaintiff is under a duty "to look where he was going and to observe that which was in plain sight in front of him." (*Curland* v. *Los Angeles County Fair Assn.,* 118 Cal.App.2d 691, 695 [258 P.2d 1063].) But the same case on the same page also points out: "Whether the danger was obvious to plaintiff was a question of fact for the jury. [Citations.] Whether a person, under the circumstances, made a reasonable use of his [faculties] is also a question for the jury." ' "

In *Simon* v. *City & County of San Francisco,* 79 Cal.App.2d 590, 598 [180 P.2d 393], a drunken pedestrian was struck by a streetcar in the middle of the block on Geary Street in San Francisco; the plaintiff testified that he remembered reaching the corner, looking both ways, hearing nothing, and next remembered waking up two months later in the hospital. The District Court of Appeal reversed a judgment for defendant on a directed verdict and stated:

"It is just as clear that it cannot be held, as a matter of law, that plaintiff was guilty of contributory negligence proximately causing the injuries. These are questions of fact that should have been submitted to the jury. The evidence most favorable to plaintiff shows that, as a result of the accident, he is unable to remember just how the accident occurred. It is now well settled in this state that where a plaintiff by reason of loss of memory is unable to testify respecting his conduct at and immediately before the time of the accident, and produces no witnesses who testify to such facts, he is entitled to the benefit of the presumption that he was exercising due care. This presumption is itself evidence sufficient to create a conflict with the evidence produced by defendant, and requires that the issue of contributory negligence be submitted to the jury." (See also *Johnson* v. *Popso,* 194 Cal. App.2d 449, 455 [14 Cal.Rptr. 834].)

The plaintiff here, suffering from retrograde amnesia, was unable to testify in detail as to how the accident happened. He was entitled to the benefit of the presumption of due care, and this alone would prevent a finding of contributory negligence as a matter of law. (*Smellie* v. *Southern Pac. Co.,* 212 Cal. 540, 549 [299 P. 529].)

The respondent Harris argues that the plaintiff had used the elevator on preceding days in the course of his work, that the danger must have been known to him and that it was obvious; it relies in part upon the line of authorities holding that an invitee must take a building under construction as he finds it. While all of these abstract principles find support from time to time in appellate opinions, they are always applied to the specific facts involved in the cases cited and do not constitute an answer to the factors favoring the plaintiff's cause in the present litigation. It seems clear to us that a general duty was owed to McCall by the Harris people, that it could be reasonably contended that it was not fulfilled, and that the construction company could have been found guilty of negligence by a jury. Similarly, it was for the finder of fact to determine whether the plaintiff was guilty of contributory negligence. Needless to say, we are passing only on the question whether or not the trial court was justified in taking the case from the jury and deciding it as a matter of law. The ultimate determination of the facts here involved is the function of the jury.

The judgment is affirmed as to Otis Elevator Company, a

corporation, and reversed as to Harris Construction Company, a corporation.

Brown (R. M.), J., and Stone, J., concurred.

A petition for rehearing was denied on September 3, 1963, and the following opinion was then rendered.

THE COURT.—In their petition for rehearing, counsel for respondents profess not to be able to understand the rationale of our decision. It is really quite simple. We again point out the four elements which compel a conclusion that the judgment of nonsuit in favor of the Harris Construction Co. must be reversed: (1) The plaintiff, acting in the course of his employment, had a right to be where he was before the accident; (2) there was ample evidence of the negligence of the Harris Construction Co., including its deliberate disruption of the safety locking devices on the elevator doors, the inadequate lighting of the elevator shaft, the failure to maintain an operator or to give adequate warning of the danger, all of which the jury was entitled to pass upon; (3) the causal connection between such negligence, if it were found by the jury to exist, and the injury sustained by the plaintiff, is apparent; (4) the questions whether the peril was "obvious," or should have been known to the plaintiff, or whether he was guilty of contributory negligence, were not conceded; they were factual issues which should have been submitted to the jury.

The petition for a rehearing is denied.

The petition of respondent Harris Construction Co. for a hearing by the Supreme Court was denied October 1, 1963.