[Civ. No. 34912. First Dist., Div. One. Feb. 25, 1976.]

HANNAH R. STILLS et al., Plaintiffs and Appellants, v.
RICHARD GRATTON et al., Defendants and Respondents.

COUNSEL

Goldstein, Barceloux & Goldstein, P. M. Barceloux, Burton J. Goldstein, Albert E. Levy, Ralph Golub, Keith S. Humpherys, Ronald E. Stewart and M. Reed Hunter for Plaintiffs and Appellants.

Hassard, Bonnington, Rogers & Huber, Robert D. Huber, Richard G. Logan, Anderson & Geary, Robert L. Anderson and Russell Bruno for Defendants and Respondents.

OPINION

**WEINBERGER, J.**\*—In this action for medical malpractice filed by Hannah R. Stills and her minor son, Jessie Stills, against Doctors Richard Gratton and Allen F. Smoot, judgments of nonsuit were entered at the conclusion of plaintiffs' evidence in favor of the defendants and against the plaintiffs. This appeal is from the judgments so entered.

The right to move for a judgment of nonsuit is granted by Code of Civil Procedure section 581c. As was stated in *Williams* v. *Goodwin* (1974) 41 Cal.App.3d 496, 509 [116 Cal.Rptr. 200]: "The propriety of the trial court's ruling in taking the case from the jury must be tested by the stringent rule relating to nonsuit. The rule is that ' "[A] nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff." ' (*O'Keefe* v. *South End Rowing Club, supra,* 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; *McCall* v. *Otis Elevator Co., supra,* 219 Cal.App.2d 22, 24-25 [33 Cal.Rptr. 44].)" (See also 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 353, pp. 3152-3153.) The following is a summary of the evidence before the trial court at the close of the plaintiffs' case to which the stated stringent rule relating to nonsuits must be applied.

In late May or early June 1969 appellant Hannah Stills suspected that she was unmarried, unemployed, and a part-time art

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the \dicial Council.

student with a history of emotional problems which she described as "Depression and feelings of alienation." She was frightened at the prospect of having a child.

On June 10, 1969, on the recommendation of a friend, she visited Dr. Gratton, an obstetrics-gynecology specialist, who confirmed her pregnancy, and after discussing her emotional state, advised her that it might be in her best interest to have a therapeutic abortion. He informed her that it would be necessary for her, in order to qualify for such legal abortion under the provisions of Health and Safety Code section 25951, to obtain the approval of the hospital committee and to be examined by two psychiatrists with whom appointments were scheduled. On a return visit to Dr. Gratton on June 20th, Miss Stills was advised that arrangements had been made for a therapeutic abortion to be performed by him in Children's Hospital, San Francisco, on July 8, 1969. She entered the hospital the day before the surgery and was discharged on July 9th, going to her mother's apartment in San Francisco where she remained until July 25th when she moved to Los Angeles, as she had previously informed Dr. Gratton was her intention.

An expert witness called by appellants testified that standard procedure required that a specimen of the tissue removed from a patient be submitted for pathological study and report. ■ The report in the instant case, dated July 10, 1969, indicated that upon gross examination (with the naked eye) the material removed from the patient's uterus revealed "placental tissue." However, microscopic examination showed no placental tissue and the final diagnosis by the pathologist was that the specimen was "desidua," meaning the inner lining of the uterus. This diagnosis, according to appellants' expert, indicates that the abortion had been unsuccessful.

Dr. Gratton conceded that the report, which he testified he received about July 20th, did not confirm that the fetus had been removed, but it was his opinion that since the gross examination revealed placental tissue the pathologist had simply failed to pick it up microscopically. He did not request any further studies because he believed the operation was a success.

There was also expert testimony that the 1969 standard of care for a doctor who had performed an abortion was to read the pathology report and to examine the patient after about two weeks "to make certain, as much as possible, that things have gone well, and the problem has been resolved."

Dr. Gratton testified that he normally required a return visit within two or three weeks but that in this case the patient had told him she was going directly to Los Angeles and had no forwarding address there. Miss Stills testified that she had no recollection of Dr. Gratton telling her that she should have a checkup following her abortion. Dr. Gratton testified that he did tell her that, under normal conditions, he would want to see her after about two to three weeks. He did not testify that he recommended that she arrange to see some other doctor in Los Angeles.

On or about August 8, 1969, Miss Stills went to a Dr. Wood in Los Angeles for. a checkup and for birth control pills. She was told by him that he thought she was pregnant and a urine test confirmed this diagnosis. On the same day, appellant called Dr. Smoot, who had been her family doctor in San Francisco for several years. Upon learning that Miss Stills had seen a doctor in Los Angeles, that she had had an earlier abortion, and the result of the new pregnancy test, Dr. Smoot asked her who had performed the operation. On being told the doctor's name he suggested that he call Dr. Gratton to try to find out what was going on. A day or so later, appellant called Dr. Smoot again. He told her that according to Dr. Gratton she had been completely aborted, explaining that the affirmative pregnancy test may be due to her "body chemistry" not having returned to normal. He then suggested that plaintiff take a regimen of birth control pills to regulate her menstrual period, and sent her a prescription for Enovid-E. The prescription was dated August 14, 1969, and was sent to her Los Angeles address. Appellant had it filled on August 19, 1969, and took the pills for 20 days as advised by Dr. Smoot. When her menstrual period did not begin within a few days after discontinuing the use of the Enovid-E, Miss Stills decided to return to San Francisco to see Dr. Smoot. She visited him in mid-September. He confirmed that she was pregnant and referred her to a Dr. Soldati for prenatal care. At this point, appellant believed that she was "too far along" to have a repeat abortion.

Dr. Soldati examined Miss Stills on September 30, 1969, and concluded she was 23 to 24 weeks pregnant. Abortion was no longer advisable because the legal deadline had passed, and because it was medically unsafe. He testified that on or about August 11, 1969, at 17 weeks, it would have been medically permissible to do a second abortion.

Doctors Gratton and Smoot agreed in essentials about their telephone conversation. After Dr. Smoot relayed what the patient had said, Dr.

Gratton told him that decidual tissue was found by the pathologist, but that in his opinion the abortion was satisfactory. He told Dr. Smoot that if there was any question at all, plaintiff should be checked by him or Dr. Smoot or some other doctor. Dr. Smoot relayed to Miss Stills the opinion of Dr. Gratton that the abortion had been completed without mentioning the pathology report. He volunteered the possibility of "body chemistry" masking the fact that a former pregnancy had been terminated by an abortion.

With regard to the prescription of Enovid-E, Dr. Smoot testified that he prescribed it in order to bring on menstrual flow and that there is no reason to use the drug if a woman is pregnant. A drug called Gestest, if taken for a short time, for example, two a day for two days, would produce the same effect as Enovid-E, if the patient is not pregnant. If no menstruation occurs after the Gestest regimen, then further testing is called for. Dr. Smoot did not use Gestest because if the plaintiff was not pregnant, it would not protect her against conception. Dr. Gratton agreed that Enovid-E is not the "treatment of choice" if a woman is pregnant.

Under Dr. Soldati's care the appellant Hannah Stills gave birth on January 10, 1970, to plaintiff, Jessie Stills, who was described by his counsel in an opening statement as "a beautiful healthy baby boy . . . and there did not appear to be, and to this day [three and one-half years later] there does not appear to be, anything wrong with that little boy."

The issues raised by appellants are:

1. Did the trial court err in granting a nonsuit in favor of the two respondent doctors?

2. If appellants are successful in establishing liability, what is the proper measure of damages?

As regards the cause of action asserted by Hannah Stills, we conclude that the judgment of nonsuit must be reversed. The stringent rule by which a trial court's ruling on a motion for such judgment must be tested has already been stated. We must disregard conflicting evidence and give to plaintiffs' evidence all the value to which it is legally entitled, as well as indulge in every legitimate inference which may be drawn from the evidence. (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; *Balido v. Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 637 [105 Cal.Rptr.

890]; *Martin* v. *Tully* (1941) 44 Cal.App.2d 226, 234 [112 P.2d 282].) In the opinion of plaintiffs' expert the diagnosis of "desidua" by the pathologist at least suggested the possibility that the abortion had not been successful. Dr. Gratton did not agree with the diagnosis, believing that the abortion had been successfully completed. He ordered no further study of the tissue, made no effort to communicate with appellant, and even after learning from Dr. Smoot that a Los Angeles doctor had found Miss Stills to be pregnant, he persisted in his belief that his treatment of appellant had accomplished the desired objective. These facts, among others, raised questions which required resolution by the jury.

Admittedly, no expert witness was called to testify as to the standard of medical care applicable to Dr. Smoot's limited connection with the case. However, there are certain types of malpractice which may be established without requiring expert opinion. In this case the court asked plaintiffs' counsel if he didn't agree that this is a case where expert testimony is required, one where lay people couldn't decide any of the issues. Counsel replied that he was unable to agree with the court on that statement. As a matter of fact, the record discloses that among the instructions requested by plaintiffs' counsel was a res ipsa loquitur instruction. The transcript was reviewed to determine whether such instruction might possibly be appropriate in this case.

The evidence disclosed that Dr. Smoot did not properly and fully communicate to Miss Stills the information he had received from Dr. Gratton. He reported Dr. Gratton's belief that the abortion had been a success, but to account for the positive pregnancy test in Los Angeles, he volunteered the theory that "body chemistry" may have masked the fact that an earlier abortion had terminated a previous pregnancy. He failed to tell Miss Stills that Dr. Gratton had told him "for goodness sakes, when you talk to her tell her to call me immediately and we'll have her back and we'll take care of her." This was in mid-August when an abortion was still legally and medically permissible. Dr. Smoot then prescribed a 20-day regimen of Enovid-E which resulted in appellant's failure to seek further medical assistance until after the time when a legal abortion could be performed under Health and Safety Code section 25953. Whether this course of conduct constitutes negligence raises a jury question which may be resolved by resort to common knowledge without scientific enlightenment. The following cases are illustrative of the types of alleged malpractice in which expert testimony has been held to be unnecessary. As was said in *Kerr* v. *Bock* (1971) 5 Cal.3d 321, 324-325 [95

Cal.Rptr. 788, 486 P.2d 684]: "It is just common sense that after removing a substantial portion of a patient's leg bone, a doctor should warn his patient that there is considerable risk to the patient in lifting the leg horizontally until after the healing process has been completed. Neither such a warning nor the breaking of the leg is so uncommon or so complicated that expert testimony would be required in order to render a res ipsa loquitur instruction appropriate." In *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 793 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], the plaintiff had a commonplace tendonitis condition; defendant physician's injections of cortisone and a local anesthetic were the normal, common treatment for the condition; the untoward results—pain and paralysis in the back and shoulder—were extremely rare. The trial judge instructed the jury that if it found from expert testimony, common knowledge and all the circumstances that the injury was more probably than not the result of negligence, it could infer negligence from the happening of the accident alone. *Held,* this was proper. The jurors could rely on their common knowledge in determining whether the accident was of a kind that would ordinarily not have occurred in the absence of someone's negligence. (See Witkin, Cal. Evidence (2d ed. Supp. 1974) § 279A, p. 305.) The facts in the instant case are such that a conditional res ipsa loquitur instruction would be appropriate.

What has been said regarding the cause of action asserted by Hannah Stills has no applicability to the alleged cause of action asserted on behalf of the minor plaintiff, Jessie Stills. This plaintiff's pleadings allege merely that he was born out of wedlock and that "various reasons" affect him to his detriment. The testimony disclosed that Jessie was and is a healthy, happy youngster who is a joy to his mother. His only damage, if any, caused by the respondents' conduct is in being born. As was stated in *Zepeda* v. *Zepeda* (1963) 41 Ill.App.2d 240 [190 N.E.2d 849, 858] (cert. den., 379 U.S. 945 [13 L.Ed.2d 545, 85 S.Ct. 444]), "Recognition of the plaintiff's claim means creation of a new tort: a cause of action for wrongful life. The legal implications of such a tort are vast, the social impact could be staggering. If the new litigation were confined just to illegitimates it would be formidable." No court has yet recognized the tort (Comment (1972-1973) 12 J. Family L. 635, 643), and we are not persuaded that this court should be the first. The issue involved is more theological or philosophical than legal.

In *Williams* v. *State* (1966) 25 App.Div.2d 906 [269 N.Y.S.2d 786], a child sued a mental institution for failing to provide protection to the mother from assault which resulted in his being born a bastard with a

mentally deficient mother. The court rejected the argument that damages could be measured by comparing the plaintiff with a child born without the handicap of bastardy, stating, at page 908, that damages "would have to comprehend the infirmities inherent in claimant's situation as against the alternative of a void, if nonbirth and nonexistence may thus be expressed; and could not, without incursion into the metaphysical, be measured against the hypothesis of a child or imagined entity in some way identifiable with claimant but of normal and lawful parentage and possessed of normal or average advantages." (See also *Gleitman* v. *Cosgrove* (1967) 49 N.J. 22 [227 A.2d 689, 22 A.L.R.3d 1411]; *Jacobs* v. *Theimer* (Tex. 1975) 519 S.W.2d 846, 849.)

In tort, damages serve to compensate a plaintiff for injury caused by a defendant's conduct, and are awarded to the extent that a plaintiff can be restored to the position he would have occupied had the tort not occurred. (*Wright* v. *Rogers* (1959) 172 Cal.App.2d 349, 365 [342 P.2d 447].) "This court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies." (*Gleitman* v. *Cosgrove, supra,* 49 N.J. 22, 28 [227 A.2d 689, 692, 22 A.L.R.3d 1411].)

■ In answer to respondents' contention that the fact of birth does not constitute a compensable injury, plaintiff Jessie Stills refers to Civil Code section 29, which states that "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; . . ." Nothing in this section obviates the requirement that to recover in tort a compensable injury must be alleged and proved. The motion for a nonsuit has been described as the modern equivalent of a demurrer to the evidence; it concedes the truth of the facts proved, but denies that they, as a matter of law, sustain the plaintiff's case. (*Bush* v. *Wood* (1908) 8 Cal.App. 647, 650 [97 P. 709]; *Archibald Estate* v. *Matteson* (1907) 5 Cal.App. 441, 445 [90 P. 723]; see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 350, p. 3150.)

■ It is concluded that the trial court's ruling on the motion for nonsuit on the fifth cause of action dealing with the alleged claim of Jessie Stills was correct, but the judgment entered in favor of respondent doctors against Hannah Stills, for the reasons set forth, must be reversed and the cause remanded for retrial on the issue of the malpractice, if any, of the respondents or either of them.

Both sides, anticipating the possibility that a retrial might be required, have briefed the question of what damages are recoverable in order to obtain a determination at this time to avoid repetitious appeals.

■ Some jurisdictions, for public policy reasons, deny damages when malpractice results in the birth of a healthy child. The reasoning, most recently expressed by the Wisconsin Supreme Court, assumes that the benefits of a child, as a matter of law, outweigh the burdens: "Every child's smile, every bond of love and affection, every reason for parental pride in a child's achievements, every contribution by the child to the welfare and well-being of the family and parents, is to remain with the mother and father. For the most part, these are intangible benefits, but they are nonetheless real." (*Rieck* v. *Medical Protective Soc.* (1974) 64 Wis.2d 514 [219 N.W.2d 242, 244]; see also similar language in *Shaheen* v. *Knight* (1957) 11 Pa. D. & C.2d 41, 45-46; *Christensen* v. *Thornby* (1934) 192 Minn. 123, 126 [255 N.W. 620, 622, 93 A.L.R. 570]; *Ball* v. *Mudge* (1964) 64 Wn.2d 247, 250 [391 P.2d 201, 204].)

Certain courts have ruled in favor of granting the parents a cause of action, without discussion of the question of damages. (*Stewart* v. *Long Island College Hospital* (1968) 58 Misc.2d 432 [296 N.Y.S.2d 41, 47-48]; *Jackson* v. *Anderson* (Fla.App. 1970) 230 So.2d 503.) Others have recognized the cause of action, but refused to apply the standard measure of tort damages. They limit the recovery permitted, using the same public policy reasons cited in *Rieck* v. *Medical Protective Soc., supra.* For example, in *Jacobs* v. *Theimer, supra,* 519 S.W.2d 846, the court was faced with a demand for the cost of raising a child afflicted with defects resulting from rubella, who would have been aborted except for alleged negligence. The court allowed recovery for costs reasonably related to the child's physical defects but excluded expenses to be incurred in raising the child, following another Texas case, *Terrell* v. *Garcia* (Tex.Civ.App. 1973) 496 S.W.2d 124 (cert. den., 415 U.S. 927 [39 L.Ed.2d 484, 94 S.Ct. 1434]), in which the court said at page 128: "Who can place a price tag on a child's smile or the parental pride in a child's achievement? Even if we consider only the economic point of view, a child is some security for the parents' old age. Rather than attempt to value these intangible benefits, our courts have simply determined that public sentiment recognizes that these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child."

Similarly, in *Coleman* v. *Garrison* (Del.Super. 1974) 327 A.2d 757, parents of a healthy child born of a failed sterilization operation were

limited to their actual expenses and anxieties attending the unexpected pregnancy.

A third group of cases recognizes the parents' cause of action and gives damages according to normal tort principles, without limitations based on public policy. For example, in *Ziemba* v. *Sternberg* (1974) 45 App.Div.2d 230 [357 N.Y.S.2d 265, 268], the court said that " 'the person responsible must respond for all damages resulting directly from and as a natural consequence of the wrongful act according to common experience and in the usual course of events, whether the damages could or could not have been foreseen by him.' " (Accord, *Cox* v. *Stretton* (1974) 77 Misc.2d 155 [352 N.Y.S.2d 834, 842]; *Bishop* v. *Byrne* (S.D.W.Va. 1967) 265 F.Supp. 460, 463 (dicta); *Troppi* v. *Scarf* (1971) 31 Mich.App. 240 [187 N.W.2d 511, 514]; *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303, ·325 [59 Cal.Rptr. 463, 27 A.L.R.3d 884].)

In *Custodio,* the court dealt at some length with the problem presented here. The policy arguments against the parents' cause of action advanced by courts in other jurisdictions were analyzed, subjected to critical review, and finally rejected in favor of the concept that the usual damages recoverable under established tort principles should be recoverable upon a proper finding of malpractice in a case of this type.

In *Troppi* v. *Scarf, supra,* 187 N.W.2d 511, the court gave a lucid rebuttal to the various policy reasons used to deny a cause of action to the parents, or to limit their recovery, against the normal rules of tort damages. In that case, the defendant druggist negligently failed to provide the birth control drug prescribed for plaintiff mother. It resulted in the birth of an eighth· child. The court concluded that there was no valid reason why the trier of fact should not be free to assess damages as it would in any other negligence case. (*Id.,* at p. 516.) The court said that contrary to the idea that to allow damages would be against public policy, both state and federal governments encourage birth control.

Considering the argument that a child always confers an overriding benefit to the parents, the court applied the rule announced in the Restatement of Torts, section 920, page 616, as follows: "Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable."

The court in *Troppi* also considered the argument often raised: that parents of the unwanted child should either pay for the child's upbringing themselves or put the child out for adoption.

Many parents feel a moral sense of obligation to bring up as best they can a child unwanted at the time of conception. "A living child almost universally gives rise to emotional and spiritual bonds which few parents can bring themselves to break." (*Troppi* v. *Scarf, supra,* 187 N.W.2d 511 at p. 519.) No court can say as a matter of law that every mother, wed or unwed, is required to abort or place her child for adoption. (*Id., at* p. 520.)

In our opinion the holding in *Custodio* correctly states the law of this state and, along with similar cases such as *Troppi,* clearly demonstrates the weakness of the policy arguments which would limit full compensation recoverable for tort as provided in Civil Code section 3333. Accordingly, plaintiff Hannah Stills, in the event the triers of fact find in her favor on the liability issue, should be permitted to recover all the damages to which she is entitled under ordinary tort principles. Under those same principles the defendants may prove any offsets for benefits conferred and amounts chargeable to a plaintiff under her duty to mitigate damages.

The judgment of nonsuit as to the purported claim of plaintiff Jessie Stills, by and through his guardian ad litem, is affirmed. The judgment against Hannah Stills, individually, and in favor of the respondents Richard M. Gratton and Allen F. Smoot, is reversed and the matter is remanded to the trial court for proceedings in accord with the views herein expressed. Costs are awarded to appellant Hannah R. Stills.

Sims, Acting P. J., and Elkington, J., concurred.