[S.F. No. 24319. May 3, 1982.]

JOY TURPIN, a Minor, etc., Plaintiff and Appellant, v.
ADAM J. SORTINI et al., Defendants and Respondents.

COUNSEL

Joseph P. Stretch for Plaintiff and Appellant.

Stammer, McKnight, Barnum & Bailey and Daniel O. Jamison for Defendants and Respondents.

Musick, Peeler & Garrett, James E. Ludlam, Horvitz & Greines, Ellis J. Horvitz and Kent L. Richland as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**KAUS, J.**—This case presents the question of whether a child born with an hereditary affliction may maintain a tort action against a medical care provider who—before the child's conception—negligently failed to advise the child's parents of the possibility of the hereditary condition, depriving them of the opportunity to choose not to conceive the child. Although the overwhelming majority of decisions in other jurisdictions recognize the right of *the parents* to maintain an action under these circumstances, the out-of-state cases have uniformly denied *the child's* right to bring what has been commonly termed a "wrongful life" action. In *Curlender* v. *Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477], however, the Court of Appeal concluded that under California common law tort principles, an afflicted child could maintain such an action and could "recover damages for the pain and suffering to be endured during the limited life span available to such a child and any special pecuniary loss resulting from the impaired condition" (*id.*, at p. 831), including the costs of medical care to the extent such costs were not recovered by the child's parents. In the case at bar, a different panel of the Court of Appeal disagreed with the conclusion in *Curlender* and affirmed a trial court judgment dismissing the child's cause of action on demurrer. We granted a hearing to resolve the conflict.

I

The allegations of the complaint disclose the following facts. On September 24, 1976, James and Donna Turpin, acting on the advice of their pediatrician, brought their first—and at that time their only—daughter, Hope, to the Leon S. Peters Rehabilitation Center at the Fresno Community Hospital for evaluation of a possible hearing defect.[1] Hope was examined and tested by Adam J. Sortini, a licensed professional specializing in the diagnosis and treatment of speech and hearing defects.

The complaint alleges that Sortini and other persons at the hospital negligently examined, tested and evaluated Hope and incorrectly advised her pediatrician that her hearing was within normal limits when, in reality, she was "stone deaf" as a result of an hereditary ailment.

---

[1] The complaint does not state how old Hope was at the time of the examination. It does indicate, however, that Hope was two years old when the complaint was filed in July 1978.

Hope's parents did not learn of her condition until October 15, 1977, when it was diagnosed by other specialists. According to the complaint, the nature of the condition is such that there is a "reasonable degree of medical probability" that the hearing defect would be inherited by any offspring of James and Donna.

The complaint further alleges that in December 1976, before learning of Hope's true condition and relying on defendants' diagnosis, James and Donna conceived a second child, Joy. The complaint avers that had the Turpins known of Hope's hereditary deafness they would not have conceived Joy. Joy was born August 23, 1977, and suffers from the same total deafness as Hope.

On the basis of these facts, James, Donna, Hope and Joy filed a complaint setting forth four causes of action against defendants Sortini, the hospital, the rehabilitation center and various Does. The first cause of action, brought on behalf of Hope, seeks damages for the harm Hope has allegedly suffered as a result of the delay in the diagnosis of her condition. The second cause of action—the only cause before us on this appeal—was brought on behalf of Joy and seeks (1) general damages for being "deprived of the fundamental right of a child to be born as a whole, functional human being without total deafness" and (2) special damages for the "extraordinary expenses for specialized teaching, training and hearing equipment" which she will incur during her lifetime as a result of her hearing impairment. The third and fourth causes of action, brought on behalf of James and Donna, seek, respectively, special damages relating to the support and medical care of Joy to the age of majority, and general damages for emotional distress sustained by James and Donna "attendant to the raising and caring of a totally deaf child."

Defendants demurred to the second and fourth causes of action, and after briefing and argument, the trial court sustained the demurrer without leave to amend. ■■ ■■■■ Thereafter, the court entered a judgment dismissing the action as to Joy.[2] ■■ ■■■■ As noted, Joy's action is the only matter before us on this appeal.[3]

---

[2]Joy's appeal was taken from the order sustaining the demurrer, a nonappealable order. Under rule 2(c) of the California Rules of Court, however, we treat the notice of appeal as a premature but valid notice of appeal from the subsequently entered judgment of dismissal. (See, e.g., *Marcotte* v. *Municipal Court* (1976) 64 Cal.App.3d 235, 239 [134 Cal.Rptr. 314].)

[3]Although in sustaining the demurrer to the fourth cause of action the court struck the parents' claim for damages for emotional distress, the parents' cause of action for

## II

Although this is the first case in which we have faced the question of potential tort liability in a "wrongful life" or "wrongful birth" context,[4] there is no dearth of authority in this area.[5] In recent years, many courts in other jurisdictions have confronted similar claims brought by both parents and children against medical professionals whose negligence had allegedly proximately caused the birth of hereditarily afflicted children. The overwhelming majority of the recent cases have permitted parents to recover at least some elements of damage in such actions. (See, e.g., *Robak v. United States* (7th Cir. 1981) 658 F.2d 471; *Schroeder v. Perkel* (1981) 87 N.J. 53 [432 A.2d 834]; *Berman v. Allan* (1979) 80 N.J. 421 [404 A.2d 8, 13-15]; *Becker v. Schwartz* (1978) 46 N.Y.2d 401 [413 N.Y.S.2d 895, 386 N.E.2d 807, 813-814]; *Speck v. Finegold* (1981) 497 Pa. 77 [439 A.2d 110, 111-112]; *Jacobs v. Theimer* (Tex. 1975) 519 S.W.2d 846; *Dumer v. St. Michael's Hospital* (1975) 69 Wis.2d 766 [233 N.W.2d 372, 376-377, 83 A.L.R.3d 1].) At the same time, the out-of-state authorities have uniformly rejected the children's own claims for general damages. (See, e.g., *Berman v. Allan, supra*, 404 A.2d at pp. 11-13; *Becker v. Schwartz, supra*, 386 N.E.2d at pp. 811-812; *Speck v. Finegold, supra*, 439 A.2d at p. 112, affirming by an equally divided ct. (1979) 268 Pa. Super. 342 [408 A.2d 496, 508]; *Dumer v. St. Michael's Hospital, supra*, 233 N.W.2d at pp. 374-376; *Elliot v. Brown* (Ala. 1978) 361 So.2d 546.)

The explanation for the divergent results is that while courts have been willing to permit parents to recover for medical costs or—in some

---

damages relating to the support and care of Joy during her minority remains pending in the trial court, and thus the parents' action is not appealable at this time. (See, e.g., *Bank of America v. Superior Court* (1942) 20 Cal.2d 697, 701-702 [128 P.2d 357].)

[4] While courts and commentators have not always been consistent in their terminology, "wrongful life" has generally referred to actions brought on behalf of children, and "wrongful birth" to actions brought by parents. Some authorities have broken these categories down further (see Comment, *"Wrongful Life": The Right Not to be Born* (1980) 54 Tulane L.Rev. 480, 483-485), but in this opinion we will follow the general usage: "wrongful life" for all actions brought by children and "wrongful birth" for all actions brought by parents.

[5] The subject has also proved a popular topic for legal commentators. (See, e.g., Capron, *Tort Liability in Genetic Counseling* (1979) 79 Colum.L.Rev. 618; Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling* (1978) 87 Yale L.J. 1488; Comment, *"Wrongful Life": The Right Not to be Born* (1980) 54 Tulane L.Rev. 480; Note, *A Reassessment of "Wrongful Life" and "Wrongful Birth"* (1980) 1980 Wis.L.Rev. 782; Kelley, *Wrongful Life, Wrongful Birth and Justice in Tort Law* (1979) 4 Wash.U.L.Q. 919.)

cases—other harms which the parents would not have incurred "but for" the defendants' negligence, they have been reluctant to permit the child to complain when, but for the defendant's negligence, he or she would not have been born at all. In this context the recent decisions have either concluded that the child has sustained no "legally cognizable injury" or that appropriate damages are impossible to ascertain.

While our court has not yet spoken on the question, three California Court of Appeal decisions have addressed somewhat related claims. *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884], the earliest California case in this area, involved an action brought solely by parents against a physician whose negligence in performing a sterilization operation failed to prevent the plaintiff wife's pregnancy and the birth of a healthy child—the family's 10th. The *Custodio* court, applying generally applicable tort principles, upheld the parents' right to bring the action. Although the court did not define the full scope of recoverable damages in such an action (*id.*, at p. 326), it did indicate that numerous items of damage normally recoverable in a tort action could properly be awarded. (*Id.*, at pp. 318-326.)

In the second case, *Stills* v. *Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652], both an unmarried mother and her healthy son brought consolidated actions against several doctors who had negligently performed a therapeutic abortion, leading to the unexpected and unwanted birth of the child. With respect to the mother's claim, the *Stills* court followed *Custodio* and permitted the action, concluding that she could recover "all the damages to which she is entitled under ordinary tort principles [subject to] . . . any offsets for benefits conferred and amounts chargeable to a plaintiff under her duty to mitigate damages." (*Id.*, at p. 709.)

With respect to the son's claim, however, the court determined that no cause of action would lie. Although the child had alleged that "he was born out of wedlock and that 'various reasons' affect him to his detriment" (*id.*, at p. 705), the *Stills* court noted that the testimony at trial disclosed that the boy "was and is a healthy, happy youngster who is a joy to his mother" (*ibid.*) and thus that "[h]is only damages, if any, caused by the respondents' conduct is in being born." (*Ibid.*) Relying on earlier Illinois and New York decisions which had rejected similar wrongful life claims by healthy children of unmarried parents (*Zepeda* v. *Zepeda* (1963) 41 Ill.App.2d 240 [190 N.E.2d 849]; *Williams* v. *State* (1966) 25 App.Div.2d 906 [269 N.Y.S.2d 786]), the *Stills* court

denied the son's action, suggesting that "[t]he issue involved is more theological or philosophical than legal." (55 Cal.App.3d at p. 705.)

The third and most recent Court of Appeal decision in this area is *Curlender* v. *Bio-Science Laboratories, supra,* 106 Cal.App.3d 811, an action brought solely on behalf of a child, not her parents. Unlike *Custodio* and *Stills,* in which the defendants' negligence had led to the births of healthy, albeit unplanned, children, in *Curlender* the child-plaintiff was afflicted with Tay-Sachs disease, a fatal illness "'characterized by partial or complete loss of vision, mental underdevelopment, softness of the muscles, convulsions, etc.'" in which the child has a very reduced life span. (*Id.,* at p. 815, fn. 4, quoting Schmidt's Attorneys' Dict. of Medicine (1980).) The principal defendant in *Curlender* was a medical laboratory which allegedly had been negligent in performing blood tests which the child's parents had undergone for the specific purpose of determining if their offspring were likely to suffer from Tay-Sachs disease.

In *Curlender,* the court reviewed the out-of-state and California precedents in this area at some length. The court distinguished *Stills* as a case in which the unwanted but healthy child had suffered no "injury," and concluded that the severely afflicted child in the case before it had suffered an injury which could properly be the basis of an action in tort. (*Id.,* at p. 825.) Disagreeing with the out-of-state decisions which had found that a child who has been born with serious hereditary defects as opposed to not being born at all has suffered no legally cognizable injury, the *Curlender* court stated: "The reality of the 'wrongful life' concept is that such a plaintiff *exists* and *suffers,* due to the negligence of others. It is neither necessary nor just to retreat into meditation on the mysteries of life. We need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all. The certainty of genetic impairment is no longer a mystery. In addition, a reverent appreciation of life compels recognition that plaintiff, however impaired she may be, has come into existence as a living person with certain rights." (Original italics.) (*Id.,* at p. 829.)

Taking up the issue of damages, the *Curlender* court rejected the plaintiff's request for damages "based upon an actuarial life expectancy ... of more than 70 years—the life expectancy if plaintiff had been born without Tay-Sachs disease" (*id.,* at p. 830) but, at the same time, also rejected "the notion that a 'wrongful life' cause of action involves

any attempted evaluation of a claimed right *not* to be born." (Original italics.) (*Id.*, at pp. 830-831.) Instead, the court held that in such an action a child may "recover damages for the pain and suffering to be endured during the limited life span available to such a child and any special pecuniary loss resulting from the impaired condition." (*Id.*, at p. 831.) The court also made it clear that, to the extent that the costs of care were not recovered by the child's parents in a separate or consolidated action, the child should be permitted to recover such costs in her own suit. (*Ibid.*)

Plaintiff, of course, relies heavily—indeed exclusively—on the *Curlender* decision in support of her action in this case. Before analyzing *Curlender* and the out-of-state wrongful life decisions, however, we briefly consider the effect of a new statute enacted in the wake of *Curlender.*

## III

As noted, the defendant in *Curlender* was a medical laboratory which allegedly had been negligent in conducting blood tests. In the course of its opinion, however, the *Curlender* court indicated in dictum that in an appropriate case parents of a seriously impaired infant, who, with full knowledge of the child's likely condition, "made a conscious choice to proceed with a pregnancy" (*id.*, at p. 829) could be held liable "for the pain, suffering and misery which they have wrought upon their offspring." (*Ibid.*)

In evident response to this suggestion of possible parental liability for deciding to conceive or failing to abort a potentially defective child, the Legislature enacted section 43.6 of the Civil Code, effective January 1, 1982. Section 43.6 relieves the parents of any liability in this situation and also provides that the parents' decision shall neither be "a defense in any action against a third party" nor "be considered in awarding damages in any such action." (Stats. 1981, ch. 331, § 1.)[6]

---

[6]Section 43.6 reads in full: "(a) No cause of action arises against a parent of a child based upon the claim that the child should not have been conceived or, if conceived, should not have been allowed to have been born alive.

"(b) The failure or refusal of a parent to prevent the live birth of his or her child shall not be a defense in any action against a third party, nor shall the failure or refusal be considered in awarding damages in any such action.

"(c) As used in this section 'conceived' means the fertilization of a human ovum by a human sperm."

■ We conclude that section 43.6 has no significant effect on the issue before us. In this case, of course, the child is suing allegedly negligent providers of medical services, not her parents, and thus the statute clearly poses no explicit bar to the action. Although subdivision (b) of the provision implicitly recognizes that, under *Curlender*, a wrongful life action may lie against a "third party," we do not think that the statute can properly be viewed as a legislative codification of the *Curlender* holding, transforming the common law tort perceived in *Curlender* into a statutory cause of action. Both the Legislative Counsel's Digest accompanying the bill, and the adjacent sections in the Civil Code (see, e.g., Civ. Code, §§ 43.4, 43.5, 43.5, subd. (a), 43.7, 43.8, 43.9), suggest that the purpose of the legislation was simply to eliminate any liability or other similar economic pressure which might induce potential parents to abort or decline to conceive a potentially defective child. Nothing in the statutory language or legislative history suggests that the new provision was intended to impose liability on any party. Under these circumstances, the section cannot properly be read as creating a *statutory* wrongful life cause of action against third parties. In sum, the new statute does not change the fact that the issue before our court is whether, and to what extent, such a cause of action should be recognized as a matter of California common law.

IV

■ In analyzing *Curlender*, *Stills* and the numerous out-of-state cases, it may be helpful to recognize that although the cause of action at issue has attracted a special name—"wrongful life"—plaintiff's basic contention is that her action is simply one form of the familiar medical or professional malpractice action. The gist of plaintiff's claim is that she has suffered harm or damage as a result of defendants' negligent performance of their professional tasks, and that, as a consequence, she is entitled to recover under generally applicable common law tort principles.

In *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433], our court summarized the basic elements of a professional malpractice action: "The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's

negligence." (See generally, 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 488 et seq., p. 2749.)

In this case, although the Turpins' older daughter Hope, and not Joy, was defendants' immediate patient, it was reasonably foreseeable that Hope's parents and their potential offspring would be directly affected by defendants' negligent failure to discover that Hope suffered from an hereditary ailment and defendants do not contend that they owed no duty of care either to James and Donna or to Joy. (Cf. *Schroeder* v. *Peckel, supra*, 87 N.J. 53 [432 A.2d 834, 838-840].)[7] Nor do defendants assert that the complaint fails to allege adequately either a breach of their duty of care or that Joy's birth was a proximate result of the breach. (See, e.g., *Custodio* v. *Bauer, supra*, 251 Cal.App.2d at pp. 311-313, 316-317.)

Instead, defendants' basic position—supported by the numerous out-of-state authorities—is that Joy has suffered no legally cognizable injury or rationally ascertainable damages as a result of their alleged negligence. Although the issues of "legally cognizable injury" and "damages" are intimately related and in some sense inseparable, past cases have generally treated the two as distinct matters and, for purposes of analysis, it seems useful to follow that approach.

With respect to the issue of legally cognizable injury, the parties agree that the difficult question here does not stem from the fact that defendants' allegedly negligent act and plaintiff's asserted injury occurred before plaintiff's birth. Although at one time the common law denied recovery for injuries inflicted before birth, California—in tune with other American jurisdictions—has long abandoned that arbitrary limitation. (See Civ. Code, § 29; *Scott* v. *McPheeters* (1939) 33 Cal. App.2d 629 [92 P.2d 678]. See generally Robertson, *Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life* (1978) 1978 Duke L.J. 1401, 1402-1413.) Thus, if Joy's deafness was caused by negligent treatment of her mother during pregnancy, or if it resulted from a tort committed upon her mother before conception (see, e.g., *Renslow* v. *Mennonite Hospital* (1977) 67 Ill.2d 348 [367 N.E.2d 1250]; *Bergstre-*

---

[7]In cases involving contagious diseases, doctors have frequently been found to owe a duty of care to a patient's immediate family. (See cases cited in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 436-437 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

*ser* v. *Mitchell* (8th Cir. 1978) 577 F.2d 22; Annot. (1979) 91 A.L.R. 3d 316), it is clear that she would be entitled to recover against the negligent party.

Joy's complaint attempts, in effect, to bring her action within the scope of the foregoing line of cases, asserting that as a result of defendants' negligence she was "deprived of the fundamental right of a child to be born as a whole, functional human being without total deafness. . . ." While the *Curlender* decision did not embrace this approach to "injury" completely—refusing to permit the plaintiff to recover for a reduced lifespan—it too maintained that the proper point of reference for measuring defendant's liability was simply plaintiff's condition after birth, insisting that "[w]e need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all" (106 Cal.App.3d at p. 829), and rejecting "the notion that a 'wrongful life' cause of action involves any attempted evaluation of a claimed right *not* to be born." (Original italics.) (*Id.*, at pp. 830-831.)

The basic fallacy of the *Curlender* analysis is that it ignores the essential nature of the defendants' alleged wrong and obscures a critical difference between wrongful life actions and the ordinary prenatal injury cases noted above. In an ordinary prenatal injury case, if the defendant had not been negligent, the child would have been born healthy; thus, as in a typical personal injury case, the defendant in such a case has interfered with the child's basic right to be free from physical injury caused by the negligence of others. In this case, by contrast, the obvious tragic fact is that plaintiff never had a chance "to be born as a whole, functional human being without total deafness"; if defendants had performed their jobs properly, she would not have been born with hearing intact, but—according to the complaint—would not have been born at all.[8]

---

[8]This case would be entirely different if medical knowledge were such that a fetus could be treated prior to birth to cure or alleviate the hereditary defect in question. Under those circumstances, Joy could properly claim that if defendant had not negligently failed to diagnose the hereditary problem, she could have been treated *in utero* and been born as a healthy or less impaired child. Such an advance in medical science would thus make this case analogous to the prenatal injury decisions discussed above. (See *Phillips* v. *United States* (D.S.C. 1980) 508 F.Supp. 537, 543 fn. 12.) The present complaint, of course, does not suggest the availability of any such treatment for Joy's condition, but instead alleges that if James and Donna had known of Hope's condition, they would not have conceived Joy.

A plaintiff's remedy in tort is compensatory in nature and damages are generally intended not to punish a negligent defendant but to restore an injured person as nearly as possible to the position he or she would have been in had the wrong not been done. (See generally Rest. 2d Torts, § 901, com. a; *Stills* v. *Gratton, supra,* 55 Cal.App.3d at p. 706; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 842, p. 3137 and cases cited.) Because nothing defendants could have done would have given plaintiff an unimpaired life, it appears inconsistent with basic tort principles to view the injury for which defendants are legally responsible solely by reference to plaintiff's present condition without taking into consideration the fact that if defendants had not been negligent she would not have been born at all. (See Capron, *Tort Liability in Genetic Counseling* (1979) 79 Colum.L.Rev. 619, 654-657; Comment, *"Wrongful Life": The Right Not to be Born* (1980) 54 Tulane L.Rev. 480, 494-497.)

If the relevant injury in this case is the change in the plaintiff's position attributable to the tortfeasor's actions, then the injury which plaintiff has suffered is that, as a result of defendants' negligence, she has been born with an hereditary ailment rather than not being born at all. Although plaintiff has not phrased her claim for general damages in these terms, most courts and commentators have recognized that the basic claim of "injury" in wrongful life cases is "[i]n essence ... that [defendants], through their negligence, [have] forced upon [the child] the worse of ... two alternatives[,] ... that nonexistence—never being born—would have been preferable to existence in [the] diseased state." (*Speck* v. *Finegold* (1979) 268 Pa.Super. 342 [408 A.2d 496, 511-512] (conc. & dis. opn. by Spaeth, J.), affd. (1981) 497 Pa. 77 [439 A.2d 110].)

Given this view of the relevant injury which the plaintiff has sustained at the defendant's hands, some courts have concluded that the plaintiff has suffered no legally cognizable injury on the ground that considerations of public policy dictate a conclusion that life—even with the most severe of impairments—is, as a matter of law, always preferable to nonlife. The decisions frequently suggest that a contrary conclusion would "disavow" the sanctity and value of less-than-perfect human life. (See, e.g., *Berman* v. *Allen, supra,* 404 A.2d at pp. 12-13; *Phillips* v. *United States, supra,* 508 F.Supp. at p. 543.)

Although it is easy to understand and to endorse these decisions' desire to affirm the worth and sanctity of less-than-perfect life, we ques-

tion whether these considerations alone provide a sound basis for rejecting the child's tort action. To begin with, it is hard to see how an award of damages to a severely handicapped or suffering child would "disavow" the value of life or in any way suggest that the child is not entitled to the full measure of legal and nonlegal rights and privileges accorded to all members of society.

Moreover, while our society and our legal system unquestionably place the highest value on all human life, we do not think that it is accurate to suggest that this state's public policy establishes—as a matter of law—that under all circumstances "impaired life" is "preferable" to "nonlife." For example, Health and Safety Code section 7186, enacted in 1976, provides in part: "The Legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition. [¶] . . . The Legislature further finds that, in the interest of protecting individual autonomy, such prolongation of life for persons with a terminal condition may cause loss of patient dignity and unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the patient." This statute recognizes that—at least in some situations—public policy supports the right of each individual to make his or her own determination as to the relative value of life and death. (Cf. *Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 662-664, 79 A.L. R.3d 205]; *Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417, 423-427].)

Of course, in the wrongful life context, the unborn child cannot personally make any choice as to the relative value of life or death. At that stage, however, just as in the case of an infant after birth, the law generally accords the parents the right to act to protect the child's interests. As the wrongful birth decisions recognize, when a doctor or other medical care provider negligently fails to diagnose an hereditary problem, parents are deprived of the opportunity to make an informed and meaningful decision whether to conceive and bear a handicapped child. (See, e.g., *Robak* v. *United States, supra*, 658 F.2d 471, 476; *Berman* v. *Allen, supra*, 404 A.2d 8, 14; *Jacobs* v. *Theimer, supra*, 519 S.W.2d 846, 849; cf. *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242-243 [104 Cal.Rptr. 505, 502 P.2d 1].) Although in deciding whether or not to bear such a child parents may properly, and undoubtedly do, take into account their own interests, parents also presumptively consider the interests of their future child. Thus, when a defendant negligently fails

to diagnose an hereditary ailment, he harms the potential child as well as the parents by depriving the parents of information which may be necessary to determine whether it is in the child's own interest to be born with defects or not to be born at all.[9]

In this case, in which the plaintiff's only affliction is deafness, it seems quite unlikely that a jury would ever conclude that life with such a condition is worse than not being being born at all. Other wrongful life cases, however, have involved children with much more serious, debilitating and painful conditions, and the academic literature refers to still other, extremely severe hereditary diseases.[10] Considering the short life span of many of these children and their frequently very limited ability to perceive or enjoy the benefits of life, we cannot assert with confidence that in every situation there would be a societal consensus that life is preferable to never having been born at all.

While it thus seems doubtful that a child's claim for general damages should properly be denied on the rationale that the value of impaired life, as a matter of law, always exceeds the value of nonlife, we believe that the out-of-state decisions are on sounder grounds in holding that

---

[9]On occasion it has been suggested that no wrongful life action may be maintained because it is impossible to determine whether, if the "child-to-be" had been informed of the risks, he or she would have preferred not to be born. As Justice Fuchsberg of the New York Court of Appeals put it in his separate opinion in *Becker* v. *Schwartz, supra*, 386 N.E.2d at page 815: "Who then can say, as it was essential to the parents' causes of action that they say for themselves, that, had it been possible to make the risk known to the children-to-be—in their cellular or fetal state or, let us say, in the mind's eye of their future parents—that the children too would have preferred not to be born at all?"

We do not, however, deny recovery to an infant who is injured when a doctor negligently fails to provide treatment chosen by the infant's parents even though we cannot determine whether the infant would have agreed with the parents' choice of treatment. Similarly, it appears anomalous to deny recovery simply because it was not possible for the "child-to-be" to make a choice. In the preconception or fetal stage, as in childhood, it is parents who nearly always make medical choices to protect their children's interests. (Cf. *Matter of Quinlan, supra*, 355 A.2d 647, 664.)

[10]In *Curlender*, for example, where the plaintiff was afflicted with Tay-Sachs disease, the complaint alleged that the child "suffers from 'mental retardation, susceptibility to other diseases, convulsions, sluggishness, apathy, failure to fix objects with her eyes, inability to take an interest in her surroundings, loss of motor reactions, inability to sit up or hold her head up, loss of weight, muscle atrophy, blindness, pseudobulper palsy, inability to feed orally, decerebrate rigidity and gross physical deformity.' It was alleged that Shauna's life expectancy is estimated to be four years. The complaint also contained allegations that plaintiff suffers 'pain, physical and emotional distress, fear, anxiety, despair, loss of enjoyment of life, and frustration....'" (106 Cal.App.3d at p. 816. See also Capron, *Tort Liability in Genetic Counseling* (1979) 79 Colum.L.Rev. 618, 650-652 & fn. 151.)

—with respect to the child's claim for pain and suffering or other general damages—recovery should be denied because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner.

Justice Weintraub of the New Jersey Supreme Court captured the heart of the problem simply and eloquently in his separate opinion in *Gleitman* v. *Cosgrove* (1967) 49 N.J. 22, 63 [227 A.2d 689, 711, 22 A.L.R.3d 1411]: "Ultimately, the infant's complaint is that he would be better off not to have been born. Man, who knows nothing of death or nothingness, cannot possibly know whether that is so. [¶] We must remember that the choice is not being born with health or being born without it ... Rather the choice is between a worldly existence and none at all.... To recognize a right not to be born is to enter an area in which no one can find his way." (See also *Becker* v. *Schwartz, supra,* 386 N.E.2d at p. 812; *Dumer* v. *St. Michael's Hospital, supra,* 233 N.W.2d at pp. 375-376.)

In responding to this proposition, plaintiff relies on numerous cases which hold that when a defendant has negligently caused a legally cognizable injury, recovery should not totally be denied simply because of the difficulty in ascertaining damages. (See, e.g., *Story Parchment Co.* v. *Paterson Co.* (1931) 282 U.S. 555, 563 [75 L.Ed.2d 544, 548, 51 S.Ct. 248].) She emphasizes that although numerous types of harm— for example, pain and suffering and mental distress—are not readily susceptible to valuation, damages for such items are routinely recoverable in professional malpractice actions, and she argues that if juries are capable of awarding damages for such nonpecuniary harm, they are equally competent to assess appropriate general damages in a wrongful life case.

We believe, however, that there is a profound qualitative difference between the difficulties faced by a jury in assessing general damages in a normal personal injury or wrongful death action, and the task before a jury in assessing general damages in a wrongful life case. In the first place, the problem is not—as it was in *Story Parchment*—simply the fixing of damages for a conceded injury, but the threshold question of determining whether the plaintiff has in fact suffered an injury by being born with an ailment as opposed to not being born at all. As one judge

explained: "When a jury considers the claim of a once-healthy plaintiff that a defendant's negligence harmed him—for example, by breaking his arm—the jury's ability to say that the plaintiff has been 'injured' is manifest, for the value of a healthy existence over an impaired existence is within the experience [or] imagination of most people. The value of nonexistence—its very nature—however, is not." (*Speck* v. *Finegold, supra*, 408 A.2d at p. 512 (Spaeth, J., conc. & dis.), affd. 439 A.2d 110.)

Furthermore, the practical problems are exacerbated when it comes to the matter of arriving at an appropriate award of damages. As already discussed, in fixing damages in a tort case the jury generally compares the condition plaintiff would have been in but for the tort, with the position the plaintiff is in now, compensating the plaintiff for what has been lost as a result of the wrong. Although the valuation of pain and suffering or emotional distress in terms of dollars and cents is unquestionably difficult in an ordinary personal injury action, jurors at least have some frame of reference in their own general experience to appreciate what the plaintiff has lost—normal life without pain and suffering. In a wrongful life action, that simply is not the case, for what the plaintiff has "lost" is not life without pain and suffering but rather the unknowable status of never having been born. In this context, a rational, nonspeculative determination of a specific monetary award in accordance with normal tort principles appears to be outside the realm of human competence.

The difficulty in ascertaining or measuring an appropriate award of general damages in this type of case is also reflected in the application of what is sometimes referred to as the "benefit" doctrine in tort damages. Section 920 of the Restatement Second of Torts—which embodies the general California rule on the subject (see, e.g., *Maben* v. *Rankin* (1961) 55 Cal.2d 139, 144 [10 Cal.Rptr. 353, 358 P.2d 681])—provides that "[w]hen the defendant's tortious conduct has caused harm to the plaintiff . . . and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."

In requesting general damages in a wrongful life case, the plaintiff seeks monetary compensation for the pain and suffering he or she will endure because of his or her hereditary affliction. Under section 920's benefit doctrine, however, such damages must be offset by the benefits

incidentally conferred by the defendant's conduct "to the interest of the plaintiff that was harmed." With respect to general damages, the harmed interest is the child's general physical, emotional and psychological well-being, and in considering the benefit to this interest which defendant's negligence has conferred, it must be recognized that as an incident of defendant's negligence the plaintiff has in fact obtained a physical existence with the capacity both to receive and give love and pleasure as well as to experience pain and suffering. Because of the incalculable nature of both elements of this harm-benefit equation, we believe that a reasoned, nonarbitrary award of general damage is simply not obtainable.

Two of our recent decisions support our conclusion that general damages may not be recovered in a wrongful life action. In *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858] and *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871], we declined to recognize a new cause of action for the loss of affection and society of the parent-child relationship, relying, inter alia, on the fact that monetary damages would neither relieve nor provide meaningful compensation for the child's or parent's loss (19 Cal.3d at pp. 447, 464) and the fact that "because of its intangible character, damages for such a loss are very difficult to measure." (*Id.,* at pp. 448, 464.) Both of these factors, of course, are present in the case at bar. A monetary award of general damages—as opposed to the claim for medical expenses discussed below—cannot in any meaningful sense compensate the plaintiff for the loss of the opportunity not to be born, and the assessment of damages is, of course, much more problematical here than in either *Borer* or *Baxter.*

V

Although we have determined that the trial court properly rejected plaintiff's claim for general damages, we conclude that her claim for the "extraordinary expenses for specialized teaching, training and hearing equipment" that she will incur during her lifetime because of her deafness stands on a different footing.[11]

---

[11]As noted, in a separate cause of action Joy's parents seek to recover, inter alia, for the medical expenses which they will incur on Joy's behalf during her minority. Since both Joy and her parents obviously cannot both recover the same expenses, Joy's separate claim applies as a practical matter only to medical expenses to be incurred after the age of majority.

As we have already noted, in the corresponding "wrongful birth" actions parents have regularly been permitted to recover the medical expenses incurred on behalf of such a child. (See, e.g., *Schroeder* v. *Perkel, supra*, 87 N.J. 53 [432 A.2d 834, 841]; *Speck* v. *Finegold, supra*, 439 A.2d 110, 111; *Robak* v. *United States, supra*, 658 F.2d 471, 478; *Becker* v. *Schwartz, supra*, 386 N.E.2d 807, 813; *Dumer* v. *St. Michael's Hospital, supra*, 233 N.W.2d 372, 377; *Jacobs* v. *Theimer, supra*, 519 S.W.2d at p. 849.) In authorizing this recovery by the parents, courts have recognized (1) that these are expenses that would not have been incurred "but for" the defendants' negligence and (2) that they are the kind of pecuniary losses which are readily ascertainable and regularly awarded as damages in professional malpractice actions.

Although the parents and child cannot, of course, both recover for the same medical expenses, we believe it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care. If such a distinction were established, the afflicted child's receipt of necessary medical expenses might well depend on the wholly fortuitous circumstance of whether the parents are available to sue and recover such damages or whether the medical expenses are incurred at a time when the parents remain legally responsible for providing such care.[12]

Realistically, a defendant's negligence in failing to diagnose an hereditary ailment places a significant medical and financial burden on the whole family unit. Unlike the child's claim for general damages, the damage here is both certain and readily measurable. Furthermore, in many instances these expenses will be vital not only to the child's well-being but to his or her very survival. (See *Schroeder* v. *Perkel, supra*, 432 A.2d 834, 841.) If, as alleged, defendants' negligence was in fact a proximate cause of the child's present and continuing need for such special, extraordinary medical care and training, we believe that it is consistent with the basic liability principles of Civil Code section 1714 to hold defendants liable for the cost of such care, whether the expense is to be borne by the parents or by the child. As Justice Jacobs of the New Jersey Supreme Court observed in his dissenting opinion[13] in

[12]Under Civil Code section 206, parents have a duty to support an adult child "in need who is unable to maintain himself by work ...." Thus, the parents' ability to recover those medical expenses which are reasonably likely to be incurred after the age of majority may depend on whether—at the time of trial—it can be determined if the child will be able to "maintain himself by work" on reaching adulthood.

[13]*Gleitman*'s denial of damages for medical expenses was recently overruled in *Schroeder* v. *Perkel, supra*, 432 A.2d 834.

*Gleitman* v. *Cosgrove, supra*, 227 A.2d at page 703: "While the law cannot remove the heartache or undo the harm, it can afford some reasonable measure of compensation towards alleviating the financial burdens."

Moreover, permitting plaintiff to recover the extraordinary, additional medical expenses that are occasioned by the hereditary ailment is also consistent with the established parameters of the general tort "benefit" doctrine discussed above. As we have seen, under that doctrine an offset is appropriate only insofar as the defendant's conduct has conferred a special benefit "to the interest of the plaintiff that was harmed." Here, the harm for which plaintiff seeks recompense is an economic loss, the extraordinary, out-of-pocket expenses that she will have to bear because of her hereditary ailment. Unlike the claim for general damages, defendants' negligence has conferred no incidental, offsetting benefit to this interest of plaintiff. (Cf. *Schroeder* v. *Perkel, supra*, 432 A.2d at p. 842.)[14] Accordingly, assessment of these special damages should pose no unusual or insoluble problems.[15]

## VI

In sum, we conclude that while a plaintiff-child in a wrongful life action may not recover general damages for being born impaired as opposed to not being born at all, the child—like his or her parents—may recover special damages for the extraordinary expenses necessary to treat the hereditary ailment.

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

Richardson, J., and Broussard, J., concurred.

---

[14]In permitting parents to recover similar extraordinary medical expenses in *Schroeder*, the court observed: "By limiting damages to those expenses that are actually attributable to the affliction, we are not conferring a windfall on Mr. and Mrs. Schroeder. Although they may derive pleasure from Thomas, that pleasure will be derived in spite of, rather than because of, his affliction. Mr. and Mrs. Schroeder will receive no compensating pleasure from incurring extraordinary medical expenses on behalf of Thomas. There is no joy in watching a child suffer and die from cystic fibrosis."

[15]Permitting recovery of these extraordinary out-of-pocket expenses whether the cost is to be borne by the parents or the child should also help ensure that the available tort remedies in this area provide a comprehensive and consistent deterrent to negligent conduct.

**NEWMAN, J.—** I concur. The evidence of legislative concern mentioned in the majority opinion (see, e.g., pp. 228 and 233, *ante*) persuades me that basic changes of the kind sought here are better left to the Legislature.

**MOSK, J.—**I dissent.

An order is internally inconsistent which permits a child to recover special damages for a so-called wrongful life action, but denies all general damages for the very same tort. While the modest compassion of the majority may be commendable, they suggest no principle of law that justifies so neatly circumscribing the nature of damages suffered as a result of a defendant's negligence.

As recently as 1980, the Court of Appeal unanimously decided in *Curlender v. Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477] that a cause of action exists for a wrongful life tort. This court subsequently denied a petition for hearing. Thus *Curlender* was, and remains, the prevailing law of California. I see no persuasive reason to either abandon its doctrine, or to dilute its effectiveness by limiting recovery to special damages.

*Curlender* found a breach of duty by the medical laboratory there involved, not only to the parents but to the child yet to be born. It then proceeded to carefully analyze the applicable law, in part, as follows:

"The circumstance that the birth and injury have come hand in hand has caused other courts to deal with the problem by barring recovery. The reality of the 'wrongful-life' concept is that such a plaintiff both *exists* and *suffers*, due to the negligence of others. It is neither necessary nor just to retreat into meditation on the mysteries of life. We need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all. The certainty of genetic impairment is no longer a mystery. In addition, a reverent appreciation of life compels recognition that plaintiff, however impaired she may be, has come into existence as a living person with certain rights.

". . . . . . . . . . . . .

"In our consideration of whether the child plaintiff has stated a cause of action, we find it instructive to look first to the statutory law of this

state. Our Civil Code section 3281 provides that '*[e]very person* who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages.' Civil Code section 3282 defines detriment as 'a loss or harm suffered in person or property.' Civil Code section 3333 provides: 'For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.'

"In addition, we have long adhered to the principle that there should be a remedy for every wrong committed. 'Fundamental in our jurisprudence is the principle that for every wrong there is a remedy and that an injured party should be compensated for all damage proximately caused by the wrongdoer. Although we recognize exceptions from these fundamental principles, no departure should be sanctioned unless there is a strong necessity therefor. [¶] The general rule of damages in tort is that the injured party may recover for all detriment caused whether it could have been anticipated or not.' (*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173].)

"We have concluded that it is clearly consistent with the applicable principles of statutory and decisional tort law in this state to recognize a cause of action stated by plaintiff against the defendants. To do otherwise would negate and run counter to the course of tort law so nobly chartered and enunciated in the landmark cases such as *Dillon v. Legg, Rowland v. Christian, Crisci v. Security Ins. Co.,* and *Rodriguez v. Bethlehem Steel Corp.* . . .

". . . . . . . . . . . . . . .

". . . Plaintiff's right to damages must be considered on the basis of plaintiff's mental and physical condition at birth and her expected condition during the . . . life span . . . anticipated for one with her impaired condition. In similar fashion, we reject the notion that a 'wrongful-life' cause of action involves any attempted evaluation of a claimed right *not* to be born. In essence, we construe the 'wrongful-life' cause of action by the defective child as the right of such child to recover damages for the pain and suffering to be endured during the . . . life span available to such a child and any special pecuniary loss resulting from the impaired condition.

"In California, infants are presumed to experience pain and suffering when injury has been established, even if the infant is unable to testify and describe such pain and suffering. In *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889 [103 Cal.Rptr. 856, 500 P.2d 880], the trial court had failed to instruct the jury on the infant plaintiff's pain and suffering; our high court reversed the jury verdict that awarded only plaintiff's medical expenses. It was observed, with respect to pain and suffering, that '[a]dmittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. [Citation.] But the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the "impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence."' (*Id.* at p. 893.)" (*Curlender* v. *Bio-Science Laboratories, supra,* pp. 829-831.) (All italics in original.)

I conclude, as did the Court of Appeal in *Curlender*, that a cause of action can be stated and that this handicapped child is entitled to her day in court.

Bird, C. J., concurred.